**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COURTHOUSE NEWS SERVICE,
*Plaintiff-Appellant*,

v.

MICHAEL D. PLANET, in his official capacity as Court Executive Officer/Clerk of the Ventura County Superior Court,
*Defendant-Appellee*.

No. 11-57187

D.C. No.
2:11-cv-08083-
R-MAN

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued May 8, 2013
Submitted April 7, 2014
Pasadena, California

Filed April 7, 2014

Before: John T. Noonan, Kim McLane Wardlaw,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Wardlaw

# SUMMARY[*]

## Civil Rights

The panel reversed the district court's dismissal of a complaint and remanded in an action brought pursuant to 42 U.S.C. § 1983 by a news organization alleging that the Ventura County Superior Court's failure to provide same-day access to newly filed unlimited civil complaints violated the news organization's right of access to public judicial proceedings under the First Amendment.

The panel held that the district court erred by abstaining from hearing the case under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), and *O'Shea v. Littleton*, 414 U.S. 488 (1974). The panel held that this case presented an important First Amendment question involving the right of access to public records and proceedings that should be decided by the federal courts and that plaintiff's requested relief would not excessively intrude on sensitive state functions. The panel noted that there may be limitations on the public's right of access to judicial proceedings, and mandating same-day viewing of unlimited civil complaints may be one of them, but the panel declined to take a position on the ultimate merits of plaintiff's claims, which the district court had yet to address in the first instance.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Rachel Matteo-Boehm (argued), Roger Myers, David Greene, and Leila Knox, Bryan Cave LLP, San Francisco, California, for Plaintiff-Appellant.

Robert A. Naeve (argued), Erica L. Reilley, and Nathaniel P. Garrett, Jones Day, Irvine, California, for Defendant-Appellee.

Lucy A. Dalglish, Gregg P. Leslie, and Kristen Rasmussen, Arlington, Virginia, for Amicus Curiae The Reporters Committee for Freedom of the Press.

## OPINION

WARDLAW, Circuit Judge:

Courthouse News Service ("CNS") is a national news organization that publishes daily reports for its subscribers about civil litigation, including the filing of new lawsuits. In courthouses around the country—large and small, state and federal—CNS reporters review civil complaints on the day they are filed. For many years, the Superior Court for the State of California for the County of Ventura ("Ventura County Superior Court") provided CNS with prompt access to newly filed "unlimited"[1] civil complaints. Now, in contrast with this prior practice, the Ventura County Superior Court

---

[1] Virtually all matters of public interest and importance are "unlimited" cases under California law. Actions seeking permanent injunctive relief, Cal. Civ. Proc. Code § 580(b)(2), or with an amount in controversy exceeding $25,000, *id.* §§ 85(a), 88, are classified as "unlimited."

withholds newly filed unlimited complaints from the public until they have been fully processed, which sometimes may take days or weeks.

CNS appeals the district court's order dismissing its complaint for declaratory and injunctive relief against Michael Planet ("Planet"), the Executive Officer/Clerk of the Ventura County Superior Court. It alleges that the Ventura County Superior Court's failure to provide same-day access to newly filed unlimited civil complaints violates its right of access to public judicial proceedings under the First Amendment to the United States Constitution. The district court granted Planet's motion to abstain from hearing the case under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), and *O'Shea v. Littleton*, 414 U.S. 488 (1974), which permit the federal courts to decline to decide matters over which they have jurisdiction but which implicate sensitive state interests. This case presents an important First Amendment question, U.S. CONST. amend. I, that should be decided by the federal courts, and CNS's requested relief would not excessively intrude on sensitive state functions. We conclude that the district court erred by abstaining and dismissing this action and, accordingly, reverse and remand.

## I.

We treat the factual allegations in CNS's complaint as true for the purpose of reviewing the district court's decision to abstain.[2]  In his motion to dismiss, Planet explicitly

---

[2] The "Motion to Dismiss and Abstain" that Planet filed in the district court was not expressly styled as a motion under either Federal Rule of Civil Procedure 12(b)(1) or Federal Rule of Civil Procedure 12(b)(6). Planet now argues that it should be construed it as a Rule 12(b)(1) motion,

represented to the district court that it was "obligated to assume the truth of the complaint's allegations," citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2002). This representation suggests that Planet's motion was a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), and that we should take the well-pleaded facts in the complaint as true. *Iqbal*, 556 U.S. at 678; *Alvarez v. Chevron Corp.*, 656 F.3d 925, 930–31 (9th Cir. 2011).

Even if we were to view Planet's motion as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it is a "facial" challenge to the federal court's exercise of jurisdiction, not a "factual" one. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).[3] A factual challenge "rel[ies] on affidavits or any other evidence

---

while CNS contends that it is more properly viewed as a Rule 12(b)(6) motion. We have not squarely held whether abstention is properly raised under Rule 12(b)(6), Rule 12(b)(1), both, or neither. *Compare, e.g.*, *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir. 2003) (reviewing the district court's decision to abstain pursuant to a Rule 12(b)(6) motion and noting that, "[i]n debating the propriety of abstention, the parties . . . rely on the facts alleged in the complaint"), *with Scotts Co. LLC v. Seeds, Inc.*, 688 F.3d 1154, 1159–60 (holding, on appeal from a dismissal under Rule 12(b)(1), that the district court abused its discretion in applying *Colorado River* abstention), *and Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 881 (9th Cir. 2011) (noting that "petitioners intervened . . . and moved to dismiss under [Rules] 12(b)(6) and 12(b)(1), or *in the alternative* to abstain from deciding the case" (emphasis added)). This case does not require us to decide which Rule, if either, provides the correct vehicle for a motion to abstain.

[3] A "facial" attack asserts that a complaint's allegations are themselves insufficient to invoke jurisdiction, while a "factual" attack asserts that the complaint's allegations, though adequate on their face to invoke jurisdiction, are untrue. *Id.*

properly before the court" to contest the truth of the complaint's allegations. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *accord Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). Planet's motion did not do so. It expressly treated the complaint's allegations as true. Nor did the district court make any findings of fact. Though Planet submitted evidence before the district court suggesting that it would be difficult for the Ventura County Superior Court to provide same-day access to newly filed complaints, he did so only in response to CNS's motion for a preliminary injunction. Planet's motion to dismiss is therefore a facial Rule 12(b)(1) motion, if it is a Rule 12(b)(1) motion at all. When reviewing the district court's grant of such a motion, we treat the factual allegations in the complaint as true. *See Safe Air for Everyone*, 373 F.3d at 1039.[4]

## II.

CNS alleges that it is a news wire service that specializes in reporting on civil lawsuits. It has about three thousand individual and institutional subscribers nationwide, including law firms, university and law school libraries, and major media outlets such as the *Los Angeles Times* and *Boston Globe*. It publishes sixteen reports on new litigation in federal and state courts in California and enables subscribers to receive email alerts about new filings involving matters of

---

[4] We also consider and treat as true CNS's factual allegations in the exhibits attached to its complaint. *See United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) ("When a plaintiff has attached various exhibits to the complaint, those exhibits may be considered in determining whether dismissal was proper . . . .").

interest to them.  CNS maintains a website with news stories and commentary freely available to the general public.

To provide this extensive news coverage, CNS employs more than one hundred reporters who daily visit courthouses around the country to review recently filed civil complaints. In state and federal courthouses throughout California and across the United States, CNS is generally able to access civil complaints on the day they are filed.  For instance, at the Los Angeles Division of the U.S. District Court for the Central District of California, reporters have a key to a room where complaints are placed in boxes for their review at the end of each day, before the complaints have been processed.  At the San Jose Division of the U.S. District Court for the Northern District of California, a clerk prints out a list of all new complaints filed each day, and reporters go behind the counter to view and scan any complaints they deem noteworthy.  At the San Francisco Division of the Northern District, reporters go behind the counter to review complaints filed each day even if the complaints have not yet been fully docketed.  The U.S. District Courts for the Southern and Eastern Districts of California also provide same-day access to new civil complaints.

In many California counties, the state Superior Court provides same-day access to newly filed unlimited complaints.  At the Superior Court for Contra Costa County, located in Martinez, California, unlimited civil complaints are placed in a media bin at 4:00 p.m. daily, and reporters are permitted to review the complaints until 4:45 p.m. even though the court closes to the general public at 3:00 p.m.  At the Santa Monica branch of the Superior Court for Los Angeles County, reporters can view the cover page of all newly filed complaints each afternoon and then request and

receive the full text of any complaint of interest. At the Superior Court for Santa Clara County in San Jose, reporters may view all unlimited civil complaints filed by 3:30 pm each day before they have been fully processed. In Riverside County, the Clerk of the Superior Court enabled same-day access to unlimited civil complaints by shifting employees' schedules to begin and end work later in the day.

Busy courts in other states do the same. At the New York County Supreme Court, the court of general jurisdiction for Manhattan, court officials place paper copies of new complaints in a secure area behind the counter where reporters can view the complaints on the day of filing. At the state trial court in Albuquerque, New Mexico, a CNS reporter is given a "review pile" of new complaints on the day they are filed, before they have been fully processed or made available on the internet.

CNS began regular coverage of new civil case filings at the Ventura County Superior Court in 2001, and the same reporter has been responsible for its coverage since then. The reporter initially visited the Ventura County Superior Court once or twice a week, and was able to review the large majority of the unlimited civil complaints that had been filed since her last visit. Beginning in early 2008, however, the clerk's office implemented "a series of small and large changes that made . . . review of new civil complaints less timely and more difficult," including, ultimately, a rule that limited the reporter to viewing twenty-five complaints each day. CNS and court staff worked out an informal arrangement that would allow CNS's reporter to access newly filed unlimited complaints before they were fully processed. The Ventura County Superior Court did not adhere to this arrangement, however, and court staff soon began

withholding complaints until after they had been fully processed.

In November 2010, CNS began covering the Ventura County Superior Court on a daily basis. It again sought to work out an informal procedure to enable same-day access for its reporter, but it could not reach agreement with court staff. In June 2011, CNS's counsel wrote to Planet, explaining that the delays in access were "effectively denials of access" and requesting that complaints be made available on the day of filing before being fully processed. CNS's counsel noted that many other courts, in California and elsewhere, allowed reporters to access complaints before full processing was complete. Three weeks later, Planet denied this request. Citing "serious resource shortages as a result of budget reductions," Planet explained that the Ventura County Superior Court could not "prioritize [same-day] access over other priorities and mandates." He refused to make complaints available before they had been fully processed, noting that "the Court must ensure the integrity of all filings." In the summer of 2011, CNS's reporter experienced delays in accessing unlimited civil complaints of up to thirty-four calendar days.

On September 29, 2011, CNS filed this action under 42 U.S.C. § 1983 in the U.S. District Court for the Central District of California. It claimed that the Ventura County Superior Court's withholding of newly filed unlimited civil complaints violated its right of access to public proceedings under the First Amendment and federal common law.[5] CNS

---

[5] It also alleged a violation of the California Rules of Court, but CNS conceded below that this claim was barred by the Eleventh Amendment and does not appeal its dismissal.

sought declaratory relief and preliminary and permanent injunctive relief. It requested an injunction "prohibiting" Planet from "continuing his policies resulting in delayed access to new unlimited jurisdiction civil complaints and denying Courthouse News timely access to new civil unlimited jurisdiction complaints on the same day they are filed, except as deemed permissible following the appropriate case-by-case adjudication."

Planet moved the district court to abstain and dismiss CNS's complaint. As Planet pointed out in his motion, an existing California statute requires that trial court records of all kinds "shall be made reasonably accessible to all members of the public." Cal Gov't Code § 68150(*l*). The statute does not define the phrase "reasonably accessible," and the parties dispute what that phrase actually requires. Planet argued that litigation in state court to clarify the meaning of § 68150(*l*) could obviate any federal constitutional issue, and that CNS's suit presented significant federalism concerns because, if CNS prevailed, federal district courts would, in effect, dictate how the state courts should allocate scarce resources.

The district court granted the motion to abstain and dismiss on November 30, 2011. It "abstain[ed] and dismisse[d]" CNS's federal claims "under the equitable abstention doctrine enunciated in *O'Shea v. Littleton*, 414 U.S. 488 (1974), and its progeny," reasoning that CNS's requested relief would interfere with the day-to-day administration of the Ventura County Superior Court and might require the federal courts to dictate the spending priorities of the California judiciary. The district court "further abstain[ed] and dismisse[d]" CNS's claims under the *Pullman* doctrine, noting that the federal constitutional question would be avoided if the California courts construed

Cal. Gov't Code § 68150(*l*) to require same-day access to newly filed unlimited civil complaints.

## III.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court's decision to invoke *Pullman* abstention under a modified abuse of discretion standard. *Smelt v. Cnty. of Orange*, 447 F.3d 673, 678 (9th Cir. 2006). We first review *de novo* whether the requirements for *Pullman* abstention are satisfied. *Id.*; *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 939 (9th Cir. 2002). If they are not, the district court has "little or no discretion" to abstain; if they are, we review the decision to abstain for an abuse of discretion. *Almodovar v. Reiner*, 832 F.2d 1138, 1140 (9th Cir. 1987).

The proper standard of review for the district court's decision to abstain under *O'Shea* is unsettled. *See E.T. v. Cantil-Sakauye*, 682 F.3d 1121, 1123 n.3 (9th Cir. 2011) (per curiam), *cert. denied*, 133 S. Ct. 476 (2012). CNS argues that *O'Shea* abstention is a particular species of abstention under *Younger v. Harris*, 401 U.S. 37 (1971), and that we therefore review the district court's decision *de novo*. *See Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 881 (9th Cir. 2011). Planet contends that *O'Shea* abstention is its own distinct form of abstention, and that we should review the district court's decision under a modified abuse of discretion standard, as we review its decision to abstain under the *Pullman* doctrine. *See World Famous Drinking Emporium, Inc. v. City of Tempe*, 820 F.2d 1079, 1081–82 (9th Cir. 1987). Even under the modified abuse of discretion standard, however, we first review *de novo* whether the legal requirements for abstention are satisfied. *See Fireman's*

*Fund Ins. Co.*, 302 F.3d at 939. Because we ultimately determine that they are not, we would reverse the district court's decision under either standard of review, and we need not decide which one applies. *See E.T.*, 682 F.3d at 1123 n.3.

## IV.

In *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), the Supreme Court declined to adjudicate a "substantial constitutional issue" that would be avoided by first giving the Texas courts the opportunity to decide whether the challenged regulation was valid under Texas law. *Id.* at 498–99. The Court reasoned that abstaining from hearing the case would prevent it from "touch[ing] a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." *Id.* at 498. The "sensitive" issue avoided was whether Texas's Jim Crow requirement that a white "conductor" rather than a black "porter" supervise every railroad sleeper car violated the Fourteenth Amendment. *Id.* at 497. Notwithstanding its ignominious origins, the doctrine of "*Pullman* abstention" remains in force. *See generally* Lauren Robel, *Riding the Color Line: The Story of* Railroad Commission of Texas v. Pullman Co., *in* FEDERAL COURTS STORIES 163 (Vicki C. Jackson & Judith Resnik eds., 2010). *Pullman* abstention is rarely appropriately invoked in cases implicating the First Amendment, however, and we conclude that the district court erred by dismissing this case under the *Pullman* doctrine.

## A.

*Pullman* abstention "is an extraordinary and narrow exception to the duty of a district court to adjudicate a

controversy." *Wolfson v. Brammer*, 616 F.3d 1045, 1066 (9th Cir. 2010) (internal alterations and quotation marks omitted). The doctrine does not "exist for the benefit of either of the parties but rather for 'the rightful independence of the state governments and for the smooth working of the federal judiciary.'" *San Remo Hotel v. City & Cnty. of S.F.*, 145 F.3d 1095, 1105 (9th Cir. 1998) (quoting *Pullman*, 312 U.S. at 501). Over time, we have developed three independently mandated requirements to permit the district court to exercise discretion to abstain under *Pullman*:

> (1) the case touches on a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to its adjudication is open, (2) constitutional adjudication plainly can be avoided if a definite ruling on the state issue would terminate the controversy, and (3) the proper resolution of the possible determinative issue of state law is uncertain.

*Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003) (internal alteration and quotation marks omitted).

*Pullman* abstention "is generally inappropriate when First Amendment rights are at stake." *Wolfson*, 616 F.3d at 1066 (internal alterations and quotation marks omitted). We have held that the first requirement for *Pullman* abstention is "almost never" satisfied in First Amendment cases "because the guarantee of free expression is always an area of particular federal concern." *Ripplinger v. Collins*, 868 F.2d 1043, 1048 (9th Cir. 1989); *accord Wolfson*, 616 F.3d at 1066 (rejecting *Pullman* abstention in challenge to limits on speech by candidates for elected judicial office); *Porter*, 319 F.3d at

492–93 (rejecting *Pullman* abstention in challenge to threatened prosecution of operators of "vote swapping" website); *Sable Commc'ns of Cal. Inc. v. Pacific Tel. & Tel. Co.*, 890 F.2d 184, 190–91 (9th Cir. 1989) (rejecting *Pullman* abstention in challenge to policy authorizing disconnection of telephone service for the transmission of explicit messages); *Playtime Theaters, Inc. v. City of Renton*, 748 F.2d 527, 532 (9th Cir. 1984) (rejecting *Pullman* abstention in challenge to zoning ordinance regulating adult movie theaters), *rev'd on other grounds*, 475 U.S. 41 (1986).[6]

The only First Amendment case in which we have ever found the first requirement for *Pullman* abstention to be satisfied, *Almodovar v. Reiner*, 832 F.2d 1138 (9th Cir. 1987), was procedurally aberrational.  There, the plaintiffs had already reached the California Supreme Court in a pending case that presented the same issues as their federal suit, so they would not need to "undergo the expense or delay of a full state court litigation" while their federal case was stayed.  *Id.* at 1140; *see Porter*, 319 F.3d at 493–94 (distinguishing *Almodovar* on the ground that it involved "an

---

[6] The second and third requirements are plainly satisfied in this case. California law provides that court records shall be "reasonably accessible" to the public.  Cal. Gov't Code § 68150(*l*).  A construction of that term that would require same-day access to filed unlimited civil complaints would provide CNS the relief it seeks.  Therefore, "constitutional adjudication could be avoided by a state ruling."  *Wolfson*, 616 F.3d at 1066.  Moreover, the meaning of "reasonably accessible" is unclear.  No published decision of a California court has interpreted that term, so "resolution of the state law issue is uncertain."  *Id*.; *see also L.A. Times v. Cnty. of L.A.*, 956 F. Supp. 1530, 1531 (C. D. Cal. 1996) (observing that claims under Cal. Gov't Code § 68150 "are novel" and "raise issues of first impression").

unusual procedural setting"). These exceptional factors are not present here.

Planet claims that this line of cases is inapposite, arguing that "this is not a 'free expression' case," but simply a case in which the government has declined to make information it possesses available to the public. Under some circumstances, the mere "governmental denial of access to information in its possession" does not raise any free speech issues. *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40 (1999). For instance, a state law placing conditions on public access to arrestees' home addresses is not subject to a facial challenge on free speech grounds because the government is under no obligation to make those addresses public at all. *Id.*

Here, however, CNS asserts its First Amendment right of access to judicial and other public proceedings. *See Press-Enterprise Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1 (1986). It is highly doubtful that "California could decide not to give out [the complaints] at all without violating the First Amendment." *Id.* (emphasis added); *cf. Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988) (holding that the First Amendment right of access applies to a summary judgment motion in a civil case). Though the government may sometimes withhold information without violating the expressive rights protected by the First Amendment, the First Amendment right of access to public proceedings—where it applies—is inextricably intertwined with the First Amendment right of free speech. *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982). This difference in the precise First Amendment right asserted by CNS does not in any way diminish the principles underlying our rule that federal courts should not invoke *Pullman* abstention in cases implicating First Amendment

rights. CNS's claims, like other First Amendment claims, raise issues of particular federal concern.

## B.

The Supreme Court has repeatedly held that access to public proceedings and records is an indispensable predicate to free expression about the workings of government. In the foundational case, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), the Court reasoned that "[f]ree speech carries with it some freedom to listen." *Id.* at 576 (plurality opinion). It held that the First Amendment guarantees of freedom of speech and freedom of the press, "standing alone," enabled access to criminal trials. *Id.* Otherwise, those rights "would lose much meaning if access to . . . the trial could . . . be foreclosed arbitrarily." *Id.* at 577. The Court later clarified that the First Amendment protects the right of public access, even though it is not explicitly enumerated therein, because "a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Globe Newspaper Co.*, 457 U.S. at 604 (internal quotation marks omitted). The right of access is thus an essential part of the First Amendment's purpose to "ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Id.*

We have similarly explained that the First Amendment right of access exists to enable free expression about important issues. "By guaranteeing that the individual citizen can effectively participate in and contribute to our republican system of self-government, the First Amendment right of access ensures that th[e] constitutionally protected discussion of governmental affairs is an informed one." *Cal. First*

*Amendment Coal. v. Woodford*, 299 F.3d 868, 874 (9th Cir. 2002) (internal quotation marks omitted). "Open government has been a hallmark of our democracy since our nation's founding. . . . Indeed, this transparency has made possible the vital work of . . . journalists who have strengthened our government by exposing its flaws." *Leigh v. Salazar*, 677 F.3d 892, 897 (9th Cir. 2012). By enabling the free discussion of governmental affairs, the right of access strengthens the core 'marketplace' of political ideas that the Founders sought to protect. *See Roth v. United States*, 354 U.S. 476, 483–84 (1957) ("[T]he unconditional phrasing of the First Amendment was not intended to protect every utterance. . . . The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."); *see also* Alexander Meiklejohn, *The First Amendment Is an Absolute*, 1961 SUP. CT. REV. 245, 255 ("The First Amendment . . . protects the freedom of those activities of thought and communication by which we 'govern.'").

Though the Supreme Court originally recognized the First Amendment right of access in the context of criminal trials, *see Richmond Newspapers*, 448 U.S. 555, the federal courts of appeals have widely agreed that it extends to civil proceedings and associated records and documents. *See, e.g.*, *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 305 (2d Cir. 2011) (finding a right of access to administrative civil infraction hearings); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1061 (3d Cir. 1984) ("We hold that the First Amendment does secure a right of access to civil proceedings."); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984) (finding a right of access to litigation committee reports in shareholder derivative suits);

*Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*, 710 F.2d 1165, 1177 (6th Cir. 1983) (holding that the First Amendment limits judicial discretion to seal documents in a civil case). The California Supreme Court has also so held. *See NBC Subsidiary (KNBC-TV), Inc. v. Superior Court*, 980 P.2d 337, 361 (Cal. 1999). Though we have not expressly held that the First Amendment right of access encompasses civil cases, we have recognized a right of access to executions, documents related to a criminal defendant's pretrial release, and criminal jury voir dire, among other proceedings. *Cal. First Amendment Coal.*, 299 F.3d at 877 (executions); *Seattle Times Co. v. U.S. Dist. Court*, 845 F.2d 1513, 1519 (9th Cir. 1988) (pretrial release documents); *United States v. Brooklier*, 685 F.2d 1162, 1168–69 (9th Cir. 1982) (voir dire). We have also applied the *Press-Enterprise II* framework to evaluate right of access claims in a variety of nonjudicial contexts. *See, e.g.*, *Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 960 F.2d 105, 109 (9th Cir. 1992) (finding a "serious constitutional question" as to whether the plaintiff was entitled to access a list of almond growers eligible to vote in a referendum on a federal regulatory order).

The news media's right of access to judicial proceedings is essential not only to its own free expression, but also to the public's. The Supreme Court has explained: "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press . . . . With respect to judicial proceedings in particular, the function of the press serves to . . . bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491–92 (1975). We have observed that the news media, when asserting the right of access, "are surrogates for the public. . . . The free press is

the guardian of the public interest, and the independent judiciary is the guardian of the free press." *Leigh*, 677 F.3d at 900 (internal quotation marks omitted); *see also* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 11.6.3 (4th ed. 2011) ("[W]ithout a right of access to government papers and places the people will be denied information that is crucial in monitoring government and holding it accountable. The press obviously plays a crucial role in this regard.").

It is thus well-established that the right of access to public records and proceedings is "necessary to the enjoyment" of the right to free speech. *Globe Newspaper Co.*, 457 U.S. at 604; *Cal. First Amendment Coal.*, 299 F.3d at 874.

### C.

CNS's First Amendment right of access claim falls within the general rule against abstaining under *Pullman* in First Amendment cases. CNS's right of access claim implicates the same fundamental First Amendment interests as a free expression claim, and it equally commands the respect and attention of the federal courts.

We join the Second Circuit in reaching this conclusion. In *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 100 (2d Cir. 2004), Connecticut newspapers challenged the state court system's longstanding practice of sealing docket sheets in certain civil cases, sometimes in the absence of any court order so requiring. *Id.* at 86–89. The Second Circuit held that the press and the public had a qualified First Amendment right of access to the docket sheets, reasoning that "docket sheets provide a kind of index to judicial proceedings and documents, and endow the public and press with the capacity

to exercise their rights guaranteed by the First Amendment."
*Id.* at 93. The Second Circuit further held that the district
court properly declined to abstain under the *Pullman* doctrine
for two reasons: first, because there was "no applicable state
statute" construction of which would avoid the constitutional
issues, and second, because "the weight of the First
Amendment issues involved counsels against abstaining." *Id.*
at 100.

We disfavor abstention in First Amendment cases because
of the "risk . . . that the delay that results from abstention will
itself chill the exercise of the rights that the plaintiffs seek to
protect by suit." *Porter*, 319 F.3d at 487; *see also Zwickler
v. Koota*, 389 U.S. 241, 252 (1967) (explaining that, in a First
Amendment facial challenge, "to force the plaintiff who has
commenced a federal action to suffer the delay of state court
proceedings might itself effect the impermissible chilling of
the very constitutional right he seeks to protect").

The concern that a delay in litigation will itself chill
speech is also implicated here. As an initial matter, we do not
believe that the norm against *Pullman* abstention in First
Amendment cases must be limited to instances in which the
plaintiff challenges a statute that directly regulates
expression. Government action that does not directly prohibit
expressive activity may nonetheless raise profound First
Amendment concerns. *See, e.g.*, *Laird v. Tatum*, 408 U.S. 1,
12–13 (1972) ("[G]overnmental action may be subject to
constitutional challenge even though it has only an indirect
effect on the exercise of First Amendment rights."); *NAACP
v. Alabama*, 357 U.S. 449, 462 (1958) (explaining that
"compelled disclosure of affiliation with groups engaged in
advocacy may constitute as effective a restraint on freedom

of association" as overly broad statutes are restraints on speech).

Moreover, this case does involve expressive activity.  As in virtually every other First Amendment case, abstention here risks stifling the expression of both the plaintiff and the public.   Abstaining in this case portends particularly egregious damage to First Amendment rights because it stifles the "free discussion of governmental affairs" that the First Amendment exists to protect.  *Globe Newspaper Co.*, 457 U.S. at 604 (internal quotation marks omitted).  In this instance, the deterred expression is not an adult film, *Playtime Theaters, Inc.*, 748 F.2d at 532, or a sexually explicit phone message, *Sable Commc'ns of Cal. Inc.*, 890 F.2d at 186, but informed public discussion of ongoing judicial proceedings.  The purpose of CNS's effort to timely access filed unlimited civil complaints is to report on whatever newsworthy content they contain, and CNS cannot report on complaints the Ventura County Superior Court withholds.

Planet incorrectly contends that CNS may not claim its expression is chilled by the delay in access to complaints because it is not subject to prosecution or punishment.  This assertion relies on case law holding that a plaintiff must be prospectively subject to "regulatory, proscriptive, or compulsory" government action to have standing to bring a facial First Amendment challenge against a statute that has not been directly enforced against him.  *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *Reporters Comm. for Freedom of the Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1052 (D.C. Cir. 1978); *see also L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 41 (1999) (Scalia, J., concurring) (finding no "'chill' upon speech that would allow a plaintiff to

complain about the application of the statute to someone other than himself"). Here, however, there is no question that CNS itself has alleged a cognizable injury caused by the Ventura County Superior Court's denial of timely access to newly filed complaints. We are simply considering, for purposes of reviewing the district court's decision to abstain, whether this alleged violation of CNS's First Amendment right of access also harms its free speech interests.

We believe it clearly does, and we do not find it meaningful to our analysis that the allegedly unlawful withholding of public judicial records, rather than the allegedly unlawful threat of prosecution, is the cause of this harm. Our precedent is ultimately concerned with abstention's effect on the plaintiff's ability to exercise "'the very constitutional right he seeks to protect.'" *Porter*, 319 F.3d at 493 (quoting *Zwickler*, 389 U.S. at 252); *J-R Distribs., Inc. v. Eikenberry*, 725 F.2d 482, 488 (9th Cir. 1984), *rev'd on other grounds sub nom. Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985). Even though it is not subject to prosecution, CNS will be unable to access judicial records and report on newsworthy proceedings during "the delay that comes from abstention . . . itself." *Porter*, 319 F.3d at 492. Like other First Amendment plaintiffs, CNS thus faces the possibility that the official conduct it challenges will prevent it from engaging in protected activity during the pendency of the state court litigation.

Abstention also risks harming the public's First Amendment interests. The general public has the same right of access as does the media. *See Cal. First Amendment Coal.*, 299 F.3d at 873 n.2. Therefore, if the Ventura County Superior Court's policy of withholding filings violates CNS's First Amendment rights, it also violates the rights of anyone

else who has tried to access a complaint—or was deterred from trying because he did not think it was possible. More important, if CNS's protected expression is delayed while the litigation proceeds in state court, then the expression of the newspapers, lawyers, libraries, and others who rely on CNS for information will also be stifled.[7] CNS is a "surrogate[] for the public," *Leigh*, 677 F.3d at 900 (internal quotation marks omitted), and the public cannot discuss the content of unlimited civil complaints about which it has no information.

CNS's right of access claim presents the same essential concerns that have compelled us to reject *Pullman* abstention in every First Amendment case except one that was uniquely postured. To hold otherwise would disregard the principle that the right of access is "necessary to the enjoyment" of the right to free speech. *Globe Newspaper Co.*, 457 U.S. at 604. The scope of CNS's right is an important question of first impression and a matter of "particular federal concern" that removes this case from the realm of "sensitive" state issues that federal courts should hesitate to address. *Ripplinger*, 868 F.2d at 1048. Because of "the weight of the First Amendment issues involved," *Hartford Courant Co.*, 380 F.3d at 100, the district court lacked the discretion to abstain under the *Pullman* doctrine.

## V.

Our analysis of *Pullman* abstention does not fully resolve the matter, however. The district court also abstained from deciding CNS's claims under *O'Shea v. Littleton*, 414 U.S.

---

[7] Indeed, our court's own library ably publishes, for internal use only, a daily news digest entitled "New and Noteworthy." The CNS website is the source for many of the included articles.

488 (1974). We must decide whether *O'Shea* provides an independent basis for abstention. Under either *de novo* review or the *de novo* component of the modified abuse of discretion standard applicable in most abstention cases, *see Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 939 (9th Cir. 2002), we conclude that *O'Shea* abstention was also improper.

A.

In *O'Shea*, nineteen plaintiffs challenged comprehensive racial discrimination in the administration of justice in Alexander County, Illinois. They alleged, among other things, that the county magistrate and judge had set higher bail for and imposed harsher sentences on black defendants than white defendants. *Id.* at 492. Relying on its then-recent decision in *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court explained that principles of comity and federalism "preclude[d] equitable intervention" because the plaintiffs sought "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials." *O'Shea*, 414 U.S. at 499–500. *Younger* had established a firm rule against enjoining ongoing state criminal proceedings, absent exceptional circumstances, and the plaintiffs in *O'Shea* simply sought to "indirectly accomplish the [same] kind of interference" through an "ongoing federal audit" of state proceedings. *Id.* at 500.

The Supreme Court later relied on the principles of *O'Shea* to hold that an injunction requiring the Philadelphia police department to draft comprehensive internal procedures to address civilian complaints was beyond the "scope of federal equity power." *See Rizzo v. Goode*, 423 U.S. 362,

378–80 (1976). *Younger* has also been extended well beyond criminal proceedings. *See, e.g.*, *Gilbertson v. Albright*, 381 F.3d 965, 968–69 (9th Cir. 2004) (en banc) (holding that *Younger* principles apply to an action for damages that relates to a pending state proceeding); *Wiener v. Cnty. of San Diego*, 23 F.3d 263, 266 (9th Cir. 1994) (explaining that *Younger* abstention is required when the federal plaintiff has an adequate opportunity to litigate federal constitutional claims in a pending state proceeding involving important state interests); *see also* 17A MOORE'S FEDERAL PRACTICE § 122.05[2][d] (3d ed. 2012) (describing the extension of *Younger*).

We have come to view *O'Shea* as standing for the more general proposition that "[w]e should be very reluctant to grant relief that would entail heavy federal interference in such sensitive state activities as administration of the judicial system." *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 703 (9th Cir. 1992). *O'Shea* compels abstention where the plaintiff seeks an "ongoing federal audit" of the state judiciary, whether in criminal proceedings or in other respects. *E.T. v. Cantil-Sakauye*, 682 F.3d 1121, 1124 (9th Cir. 2011) (per curiam), *cert. denied*, 133 S. Ct. 476 (2012); *see also Kaufman v. Kaye*, 466 F.3d 83, 86 (2d Cir. 2006) (holding that abstention was required where the relief sought would be overly "intrusive in the administration of the New York court system").

In *Los Angeles County Bar Ass'n*, the plaintiff sought a declaratory judgment that the California statute providing for 238 superior court judgeships for Los Angeles County violated the state and federal constitutions by causing major delays in the resolution of civil cases. *L.A. Cnty. Bar Ass'n*, 979 F.2d at 700. We acknowledged that a declaration that

there were too few judicial positions on the court to meet minimum constitutional requirements would prompt the California legislature to authorize new judgeships, which the governor would then have a legal duty to fill. *See id.* at 701. We declined to abstain under *O'Shea*. We reasoned that a simple declaration of the minimum number of judgeships needed to satisfy the requirements of due process would provide a clear, "useful" answer and would conclusively resolve the discrete legal dispute between the parties, even though it would "inevitably require restructuring" of the superior court. *Id.* at 703–04.

In *E.T.*, by contrast, the plaintiffs alleged that the caseloads of court-appointed attorneys representing a putative class of roughly 5,100 foster children in dependency court prevented them from providing constitutionally adequate representation. *E.T.*, 682 F.3d at 1122–23. They sought, among other forms of relief, an injunction requiring the defendants to "provide the additional resources required to comply with the Judicial Council of California and the National Association of Counsel for Children's recommended caseloads for each court-appointed attorney." *Id.* at 1123. We affirmed the district court's decision to abstain under *O'Shea*, finding that the plaintiffs were seeking an "ongoing federal audit" of the dependency court for Sacramento County. *Id.* at 1124. We reasoned that, because the plaintiffs' requested relief concerned the adequacy of representation, "potential remediation might involve examination of the administration of a substantial number of individual cases." *Id.* We distinguished *Los Angeles County Bar Ass'n* on the ground that it involved "average court delays" and violations of the right to a speedy trial that the plaintiffs alleged would be "solved by a simple increase in the number of judges." *Id.*

Read in tandem, these cases suggest that *O'Shea* abstention is inappropriate where the requested relief may be achieved without an ongoing intrusion into the state's administration of justice, but is appropriate where the relief sought would require the federal court to monitor the substance of individual cases on an ongoing basis to administer its judgment.

B.

CNS seeks preliminary and permanent injunctive relief "prohibiting" Planet from "continuing his policies resulting in delayed access to new unlimited jurisdiction civil complaints and denying Courthouse News timely access to new civil unlimited jurisdiction complaints on the same day they are filed." It also seeks a declaratory judgment that Planet's "policies that knowingly affect delays in access and a denial of timely, same-day access to new civil unlimited complaints" violate the U.S. Constitution, the federal common law, and the California Rules of Court.

The district court erred by finding that this requested relief would "impose an ongoing federal audit" of the Ventura County Superior Court. *E.T.*, 682 F.3d at 1124 (internal quotation marks omitted). The remedy that CNS seeks is more akin to the bright-line finding that we approved in *Los Angeles County Bar Ass'n* than the ongoing monitoring of the substance of state proceedings that we rejected in *E.T.* To determine whether the Ventura County Superior Court is making complaints available on the day they are filed, a federal court would not need to engage in the sort of intensive, context-specific legal inquiry that would be necessary to determine whether counsel's performance was constitutionally adequate. *See id.* There is little risk that the

federal courts would need to "examin[e] the administration of a substantial number of individual cases" to provide the requested relief. *Id.* at 1124; *see also Tarter v. Hury*, 646 F.2d 1010, 1013 (5th Cir. 1981) (holding that an injunction against excessive bail was barred by *O'Shea*, but that an injunction requiring clerks to file and docket all pro se motions was a "simple, nondiscretionary procedural safeguard" that would not be excessively intrusive).

The Ventura County Superior Court has available a variety of simple measures to comply with an injunction granting CNS all or part of the relief requested, should CNS prevail on the merits of its claims. For instance, the court could give reporters a key to a room where new complaints are placed in boxes for review before being processed, as does the Los Angeles Division of the U.S. District Court for the Central District of California. It could adopt the practice of the New York County Supreme Court in Manhattan and place paper versions of new complaints in a secure area behind the counter where reporters are free to review them on the day of filing. Or it could follow the Santa Monica branch of the Superior Court for Los Angeles County and permit reporters to view the cover page of all newly filed complaints each afternoon and request the full text of any that seem newsworthy. To permit same-day access, the Ventura County Superior Court may not need to do anything more than allow a credentialed reporter—the same reporter who has been regularly visiting the courthouse for the past twelve years—to go behind the counter and pick up a stack of papers that already exists. The federal courts would not need to "examin[e] the administration of a substantial number of individual cases" to assess whether the Ventura County Superior Court is adopting any of these methods. *E.T.*, 682 F.3d at 1124. It is therefore within the district court's

sound discretion to fashion relief that would protect First Amendment rights but would not require an "ongoing federal audit" of the Ventura County Superior Court. *Id.* The district court may also engage in fact-finding to understand the Ventura County Superior Court's resource limitations and take them into account in crafting appropriate relief.

Planet's focus on CNS's mention of "appropriate case-by-case adjudication" in its prayer for relief is misplaced. This is not CNS's requested relief, but rather is a reference to the judicial findings of fact already required by the California Rules of Court to permit a party to file a complaint under seal. Cal. R. Ct. 2.550(d), 2.551. This construction of the prayer for relief is consistent with CNS's motion for a preliminary injunction that would direct Planet "to provide [CNS] with access to new complaints no later than the end of the day on which they are filed, except in those instances where the filing party is seeking a TRO or other immediate relief or has properly filed the pleading under seal." In other words, CNS seeks relief requiring the Ventura County Superior Court to make unlimited civil complaints available the day they are filed, except where a process already exists to consider case-specific factors that may justify withholding a complaint.[8]

---

[8] Planet's assertion that CNS seeks to create a "new hearing system" is therefore incorrect. CNS does argue that judges of the Ventura County Superior Court must conduct case-by-case adjudication whenever the court seeks to seal records, and that this adjudication must be consistent with First Amendment standards. But California law already so provides, *see* Cal. R. Ct. 2.551(a) ("A record must not be filed under seal without a court order."); Cal. R. Ct. 2.550(d) (setting forth express factual findings required to seal court records), and these California rules must, of course, be applied in a manner consistent with the federal Constitution, *cf. NBC Subsidiary (KNBC-TV) Inc. v. Superior Court*, 980 P.2d 337, 361 (Cal.

Moreover, that *some* additional litigation may later arise to enforce an injunction does not itself justify abstaining from deciding a constitutional claim. Any plaintiff who obtains equitable relief under 42 U.S.C. § 1983 enforcing his constitutional rights against a state official may need to return to court to ensure compliance with the judgment. *See, e.g.*, *Gluth v. Kangas*, 951 F.2d 1504 (9th Cir. 1991) (upholding procedures established by the district court to ensure compliance with an injunction); *cf. Brown v. Plata*, 131 S. Ct. 1910, 1946 (2011) ("A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order."). Accepting Planet's view that *O'Shea* applies "when litigants seek federal court injunctions to reform the institutions of state government" would justify abstention as a matter of course in almost any civil rights action under § 1983. Mindful that the federal courts have a "virtually unflagging obligation" to exercise our jurisdiction, we decline to adopt this position. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *see also Gilbertson*, 381 F.3d at 969 n.2 ("[A]lthough there are limited circumstances in which . . . abstention by federal courts is appropriate, those circumstances are carefully defined and remain the exception, not the rule." (internal quotation marks omitted)). We also trust that the Ventura County Superior Court would comply with any federal injunction requiring it to make unlimited civil complaints available within a specified time period, so further proceedings to enforce an injunction would be unlikely.

---

1999) (holding that a provision of state law governing the closure of court proceedings must be "interpreted in a manner compatible" with the First Amendment right of access).

We conclude that the requirements of the *O'Shea* doctrine are not satisfied. An injunction requiring the Ventura County Superior Court to provide same-day access to filed unlimited civil complaints poses little risk of an "ongoing federal audit" or "a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state . . . proceedings." *O'Shea*, 414 U.S. at 500, 502. Under either *de novo* review or the *de novo* component of the modified abuse of discretion standard applicable in abstention cases, the district court erred by abstaining under *O'Shea*.

## VI.

There may be limitations on the public's right of access to judicial proceedings, and mandating same-day viewing of unlimited civil complaints may be one of them.[9] We take no position on the ultimate merits of CNS's claims, which the district court has yet to address in the first instance. But those claims raise novel and important First Amendment questions that the federal courts ought to decide. We decline to leave CNS and those who rely on its reporting twisting in the wind while the state courts address a different question entirely—the interpretation of a state law that itself recognizes the importance of public access to judicial proceedings. We reverse the judgment below and remand so that the First Amendment issues presented by this case may

---

[9] For instance, the right of access may be overcome by an "overriding [governmental] interest based on findings that closure is essential to preserve higher values." *Leigh*, 677 F.3d at 898 (quoting *Press-Enterprise II*, 478 U.S. at 9). The delay in making the complaints available may also be analogous to a permissible "reasonable restriction[] on the time, place, or manner of protected speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

be adjudicated on the merits in federal court, where they belong.

**REVERSED AND REMANDED.**