**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRENDA MILES; DANE SULLIVAN; UNION DE VECINOS, a non-profit corporation; COALITION FOR ECONOMIC SURVIVAL, a non-profit corporation; PEOPLE ORGANIZED FOR WESTSIDE RENEWAL, a non profit corporation; INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, a non-profit corporation, *Plaintiffs-Appellants*, <br><br> v. <br><br> DAVID S. WESLEY, in his official capacity as Presiding Judge of the Los Angeles Superior Court; STATE OF CALIFORNIA; EDMUND G. BROWN, JR., in his official capacity as Governor of California; SHERRI R. CARTER, Esquire, in his official capacity as Executive Officer/Clerk of the Los Angeles Superior Court, *Defendants-Appellees*. | No. 13-55620 <br><br> D.C. No. 2:13-cv-01817-MWF-RZ <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted
March 4, 2015—Pasadena, California

Filed September 8, 2015

Before: Ferdinand F. Fernandez, Barrington D. Parker, Jr.[*],
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen

**SUMMARY**[**]

**Abstention**

The panel affirmed the district court's dismissal, on federal abstention grounds, of an action challenging on statutory and constitutional grounds the Los Angeles Superior Court's plan to consolidate unlawful detainer actions into hub courts.

The panel held that the district court properly abstained under *O'Shea v. Littleton*, 414 U.S. 488 (1974), because the core of plaintiffs' challenge was to the Superior Court's management of its shrinking resources, and they sought heavy federal interference in the administration of the state judicial system.

---

[*] The Honorable Barrington D. Parker, Jr., Senior Circuit Judge for the U.S. Court of Appeals for the Second Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Richard A. Rothschild (argued), Sue L. Himmelrich, and Navneet Grewal, Western Center on Law & Poverty, Los Angeles, California; Maria Palomares, Alexander Prieto, Brian Bilford and David Pallack, Neighborhood Legal Services of Los Angeles County, Pacoima, California; Paula D. Pearlman and Michelle Uzeta, Disability Rights Legal Center, Los Angeles, California; Barbara Schultz, Paul J. Estuar, and Fernando Gaytan, Legal Aid Foundation of Los Angeles, Los Angeles, California, for Plaintiffs-Appellants.

Robert A. Naeve (argued) and Nathaniel P. Garrett, Jones Day, Irvine, California, for Defendants-Appellees the Honorable David S. Wesley and Sherri R. Carter.

Susan K. Smith, Deputy Attorney General, Office of the Attorney General, Los Angeles, California, for Defendants-Appellees State of California and Edmund G. Brown, Jr.

Karl Manheim, Los Angeles, California, for Amici Curiae Civil Rights Organizations and Law Professors.

**OPINION**

NGUYEN, Circuit Judge:

Two recessions and a decade of budget cuts have dramatically transformed the Los Angeles County Superior Court ("LASC"), the largest trial court in the country. From 2008 to 2012, LASC lost $110 million in state funding. In response, LASC closed courtrooms, furloughed employees, increased filing fees, and curtailed services to the public. In 2013, the California legislature again significantly cut funding to the judicial branch, and LASC was required to

absorb another $56 million in permanent reduction to its annual operating budget. Faced with a fiscal crisis, and already overburdened from years of shrinking budgets, LASC decided to fundamentally restructure its operations through a "consolidation plan." The plan called for wide-ranging changes, including employee layoffs, more courtroom closures, and the consolidation of proceedings in certain types of cases heard in local courthouses throughout the county into "hub" courts—specialized courts that hear only one type of case.

After LASC announced the consolidation plan (and prior to its implementation), Plaintiffs Brenda Miles, Dane Sullivan, and numerous non-profit organizations filed this class-action challenge to one aspect of it, the consolidation of unlawful detainer (tenant eviction) actions into hub courts. Plaintiffs allege various statutory and constitutional violations on the ground that reducing the number of courthouses handling unlawful detainer cases disproportionately impacts poor, disabled, and minority residents. The district court dismissed Plaintiffs' case on federal abstention grounds under *O'Shea v. Littleton*, 414 U.S. 488 (1974). We agree that *O'Shea* mandates abstention and affirm.

# I

LASC serves over 10 million residents and is the largest trial court in the country. For decades, LASC prided itself on maintaining a "neighborhood court" model with many courthouses located throughout the county. Rather than hearing cases only in a central business district like in many other parts of the country, LASC's neighborhood courthouses handled criminal and civil matters in the communities where these matters arose. This model, while costly, provided convenient access to justice for the residents

of Los Angeles County because, for most types of cases—whether small claims, traffic, unlawful detainers, or criminal in nature—no one had to travel very far to attend court proceedings. In 2000, for example, LASC operated 58 different courthouses.

California's fiscal woes in 2002 and 2003 resulted in funding cuts to the judicial branch, of which LASC is by far the largest court. *See, e.g.*, Jean Guccione, *Court Workers May Face Furloughs to Cut Costs*, L.A. Times (Apr. 4, 2003), http://articles.latimes.com/2003/apr/04/local/me-shut4; Anna Gorman, *Courts Face Closures, Job Cuts*, L.A. Times (Aug. 27, 2002), http://articles.latimes.com/2002/aug/27/local/me-court27. Then, in 2008, in the wake of a financial crisis and the resulting loss of tax revenue, the state legislature again mandated significant cuts to the courts. LASC responded with furloughs, layoffs, service reductions, and increases in fines and court fees, but the neighborhood court system was generally spared. However, as funding cuts mounted year after year, LASC was forced to close some courthouses and consolidate cases previously heard in those courts to nearby courthouses. By 2013, 12 of the 58 courthouses open in 2000 had closed. As of today, another eight have closed. *See* LASC Annual Report 2015 at 22, *available at* https://www.lacourt.org/newsmedia/uploads/2015LASCAnnualReport.pdf.

Having already suffered a total of $110 million in permanent cuts to its annual operating budgets from 2008 to 2012, LASC faced an even larger funding crisis in fiscal year 2013-2014, when it was expected to absorb an additional estimated $56 million in permanent cuts to its annual budget. LASC concluded that its neighborhood court model was no longer sustainable, and to produce the required savings, it developed a consolidation plan that fundamentally reorganized its operations across many courthouses in order

to achieve staff and service efficiencies. The plan called for many changes, including closing additional courthouses, eliminating court reporters, terminating referees in juvenile delinquency and dependency cases, and centralizing probate, small claims, and collections matters in fewer courthouses (in the case of probate, in only one courthouse). At issue in this case is one aspect of the consolidation plan— namely, the proposal, since adopted, to centralize unlawful detainer cases from 26 neighborhood courthouses to five "hub" courts across the county in Long Beach, Santa Monica, Downtown Los Angeles, Pasadena, and Lancaster.[1] The plan, which was scheduled to take effect on March 18, 2013, aimed to allow judges to handle a higher, specialized caseload per day, while at the same time ensuring that no tenant would have to travel more than 32 miles to a hub court. LASC had already implemented a hub court system for child dependency cases two decades earlier, with those matters handled in only Monterey Park and Lancaster—at a substantial distance from many locations in Los Angeles County, including the San Fernando Valley, Westside, and South Bay sub-regions.

On March 13, 2013, Plaintiffs sued the State of California, the governor, LASC's presiding judge, and the executive officer of the court, challenging the plan's closure of neighborhood courtrooms handling unlawful detainer actions. Plaintiffs claimed that because individuals with disabilities and minorities are disproportionately renters who rely on public transportation, the closure of these courtrooms

---

[1] During the pendency of this appeal, in 2015, two additional unlawful detainer hub courts opened in the City of Norwalk and the Van Nuys district of Los Angeles's San Fernando Valley. *See* LASC Annual Report 2015 at 8, *available at* https://www.lacourt.org/newsmedia/uploads/2015LASCAnnualReport.pdf.

would have a disparate impact on these communities. They claimed that the importance of neighborhood court access is heightened in light of the expedited timeline of unlawful detainer actions, the fact that most low-income tenants are not represented by counsel, and the prospect that a default judgment could render a tenant homeless. Plaintiffs alleged violations of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165, the Rehabilitation Act, 29 U.S.C. § 794, the Fair Housing Act, 42 U.S.C. § 3604(a), (b), (f)(1) and (2), and the First, Fifth, and Fourteenth Amendments under 42 U.S.C. § 1983.

On March 26, 2013, the district court dismissed the case on abstention grounds under *O'Shea v. Littleton*, 414 U.S. 488 (1974). Plaintiffs timely appealed.

## II

The parties disagree on whether our review of the district court's decision is de novo or for abuse of discretion. The applicable standard of review for *O'Shea* abstention remains unsettled, *see Courthouse News Serv. v. Planet*, 750 F.3d 776, 783 (9th Cir. 2014), but we need not decide it here because we would affirm under either standard of review.

## III

### A

The Supreme Court has repeatedly recognized a "longstanding public policy against federal court interference with state court proceedings" based on principles of federalism and comity. *Younger v. Harris*, 401 U.S. 37, 43 (1971). In *O'Shea v. Littleton*, residents of Cairo, Illinois filed a federal action alleging pervasive racial discrimination in their state court system, because black defendants were subject to higher bail and harsher sentences than white defendants. 414 U.S. at 490–92. The Supreme

Court concluded that abstention was appropriate because intervention would be "intrusive and unworkable." *Id.* at 500. The *O'Shea* Court reasoned that the relief sought by the plaintiffs—an injunction to prevent the alleged discriminatory practices in future criminal cases—would be "nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger* . . . sought to prevent." *Id.* While *O'Shea* itself addressed interference with state criminal proceedings, the Supreme Court soon recognized that "the same principles of federalism may prevent [an] injunction by a federal court of a state civil proceeding once begun." *Rizzo v. Goode*, 423 U.S. 362, 380 (1976) (broadly applying *O'Shea* to an action seeking to impose "prophylactic procedures" to reform a city police misconduct grievance procedure).

Naturally, whether *O'Shea* abstention applies is heavily fact-dependent. We have stated that generally, when "principles of federalism, comity, and institutional competence" are implicated, a federal court "should be very reluctant to grant relief that would entail heavy federal interference in such sensitive state activities as administration of the judicial system." *L.A. Cty. Bar Ass'n v. Eu* (*LACBA*), 979 F.2d 697, 703 (9th Cir. 1992). But we have examined the circumstances of each case to determine whether abstention is appropriate under *O'Shea*. Thus, in *E.T. v. Cantil-Sakauye*, we upheld the district court's *O'Shea* abstention in a class action challenging the adequacy of representation of foster children in dependency proceedings in Sacramento County Superior Court. 682 F.3d 1121, 1122 (9th Cir. 2012) (per curiam). The plaintiffs in *E.T.* originally sought injunctive relief, but they narrowed their request on appeal to only declaratory relief. *Id.* at 1124–25. Yet we nevertheless concluded that "'even the limited decree []' sought here 'would inevitably set up the precise basis for

*future intervention* condemned in *O'Shea*.'" *Id*. at 1125 (quoting *Luckey v. Miller*, 976 F.2d 673, 679 (11th Cir. 1992) (per curiam)) (emphasis in original). That is because the question of the defendants' compliance with any remedy imposed could be the subject of future court challenges. *Id*. And "[l]aying the groundwork for a future request for more detailed relief which would violate the comity principles expressed in *Younger* and *O'Shea* is the precise exercise forbidden under the abstention doctrine." *Id*. (quoting *Miller*, 976 F.2d at 679); *see also Parker v. Turner*, 626 F.2d 1, 8 (6th Cir. 1980) (holding that *O'Shea* establishes a rule of "near-absolute restraint to situations where the relief sought would interfere with the day-to-day conduct of state trials").

In contrast, we did not abstain in *LACBA*, where the plaintiff, a county bar association, raised a constitutional challenge to the adequacy of the allocation of judgeships to Los Angeles County. *LACBA*, 979 F.2d at 699–700. Although we affirmed in favor of the defendants on different grounds, we explained that *O'Shea* did not apply because once the question of the number of judges was settled, "supervision of the state court system by federal judges" would not be required. *Id.* at 703.

**B**

Turning to the facts here, we conclude that the district court properly abstained under *O'Shea*. In reaching this conclusion, we need look no further than the breadth of Plaintiffs' requested relief. Plaintiffs seek an injunction preventing LASC from eliminating even a single courthouse that, prior to the fiscal crisis, heard unlawful detainer actions. They also request an order requiring LASC to hold public meetings before planning any future unlawful detainer courtroom closures, and for the district court to retain

jurisdiction for an unspecified period of time to ensure compliance. In short, Plaintiffs seek precisely the sort of "heavy federal interference in such sensitive state activities as administration of the judicial system" that *Younger* and *O'Shea* sought to prevent. *LACBA*, 979 F.2d at 703. Because the core of Plaintiffs' challenge is to LASC's management of its shrinking resources, federal supervision in this case would place a district court "in the role of receiver for a state judicial branch." *Ad Hoc Comm. on Judicial Admin. v. Massachusetts*, 488 F.2d 1241, 1246 (1st Cir. 1973). Moreover, the level of "ongoing intrusion into the state's administration of justice," *Courthouse News*, 750 F.3d at 790, required not only to adjudicate Plaintiffs' claims, but also to monitor compliance with any judgment in their favor, would be unprecedented. We therefore conclude that abstention under *O'Shea* is proper.

We recognize that Plaintiffs raise serious access to justice concerns. For example, litigants like Plaintiffs Miles and Sullivan, who struggle with physical limitations and rely on public transportation, may have a harder time traveling from their homes to a hub court to have their cases heard. But there is no dispute that years of budget cuts have taken their toll and, by 2013, LASC's prized neighborhood court model was unsustainable. At that point, LASC's challenge was not whether to close courtrooms but rather, which courtrooms to close and where to reroute matters previously heard in those locations. Further, because allocating limited funds is a zero-sum proposition, leaving more courts open to unlawful detainer cases would necessarily involve cutting services in other important areas such as criminal, juvenile, mental health, or family law. And contrary to Plaintiffs' suggestion, LASC's restructuring did not simply target unlawful detainer cases. Instead, LASC's wide-ranging cuts included closing entire courthouses, eliminating Alternative Dispute Resolution functions wholly in civil cases and partly

in family law, substantial layoffs of personnel, and, finally, consolidating high-volume civil cases like unlawful detainers into hub courts. Out of respect for the independence of state judiciaries, a federal court cannot substitute its judgment for LASC's resource allocation choices under these circumstances. *Cf. Horne v. Flores*, 557 U.S. 433, 448 (2009) ("Federalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities. . . . When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs.").

Plaintiffs raise several additional arguments. First, they rely heavily on our decision in *LACBA*, but the facts there were far different. In *LACBA*, while we recognized that a federal court could, in theory, declare a simple number of judges required to maintain constitutional rights, we did not sanction the use of injunctive power to restructure the state courts. Nor did we condone federal interference in a state court system's determination of where, when, and how different types of cases should be heard, or how to allocate its staff and facilities. Thus, the level of federal intrusion Plaintiffs seek is far beyond what we considered in *LACBA*.

Plaintiffs also argue that adjudicating their claims requires "only a single prospective determination." But their theory of liability—which hinges largely on the difficulty that disabled plaintiffs would have in traveling up to 32 miles to court—shows why this is not so. Suppose, for example, that a judgment decreed that adequate access requires that no disabled individual be required to travel more than one hour on public transportation to an unlawful detainer courtroom. Plaintiffs could then raise noncompliance issues and request a reshuffling of hub courts with every cancellation of a bus route, change to a train schedule, or bottleneck from a

highway construction project. *Kaufman v. Kaye*, 466 F.3d 83, 87 (2d Cir. 2006) (holding that a federal court must abstain from inviting the "piecemeal" litigation condemned in *O'Shea*). Any reevaluation of whether a particular courthouse must reopen to unlawful detainer cases would necessarily require the type of ongoing "audit" that *O'Shea* forbids. The district court could even be required "to monitor the *substance* of individual cases on an ongoing basis to administer its judgment." *Courthouse News*, 750 F.3d at 790 (emphasis added). To determine whether the locations of unlawful detainer hub courts satisfy legal obligations, the district court could be required to evaluate whether individual default judgments, which Plaintiffs contend will increase, were the result of tenants' travel burdens, or simply the strength of landlords' cases.

Finally, Plaintiffs' reliance on *Tennessee v. Lane*, is unconvincing. 541 U.S. 509 (2004). In *Lane*, the Supreme Court rejected a state sovereign immunity defense to a suit involving a paraplegic who had to appear on the second-floor of a courthouse with no elevator, and was required to crawl up two flights of stairs to reach the courtroom. *Id.* at 513–14. Plaintiffs argue that, like Lane, they seek the removal of a systemic accessibility barrier that prevents disabled litigants from access to government services. However, nothing in *Lane* suggests that the accommodations may include an order for LASC to *locate* courthouses in a particular area within the county, or that a federal court may dictate and monitor a state court's allocation of its resources. *Lane* does not control the outcome of this case.

\*\*\*

The district court properly abstained under *O'Shea* from interfering with LASC's allocation of resources to address

historic budget shortfalls, and we therefore affirm the district court's dismissal of Plaintiffs' complaint.

**AFFIRMED.**