**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AMERICAN ENCORE, an Arizona non-profit corporation; KAREN GLENNON, an Arizona individual; AMERICA FIRST POLICY INSTITUTE, a non-profit corporation,

    *Plaintiffs - Appellees*,

  v.

ADRIAN FONTES, in his official capacity as Arizona Secretary of State; KRIS MAYES, in her official capacity as Arizona Attorney General,

    *Defendants - Appellants*,

and

KATIE HOBBS, in her official capacity as Governor of Arizona,

    *Defendant*.

No. 24-6703

D.C. No.
2:24-cv-01673-MTL

OPINION

Appeal from the United States District Court
for the District of Arizona
Michael T. Liburdi, District Judge, Presiding

Argued and Submitted July 15, 2025
Pasadena, California

Filed September 16, 2025

Before: Kim McLane Wardlaw, Salvador Mendoza, Jr., and
Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[*]

### Election Law

In a case in which two nonprofit corporations and an individual challenge provisions of the 2023 Arizona Election Procedures Manual (EPM), the panel affirmed the district court's preliminary injunction enjoining the EPM's Speech Provision, reversed the district court's determination that plaintiffs had standing to challenge the EPM's Canvas Provision, vacated the injunction with respect to enforcement of the Canvas Provision, and remanded.

The EPM sets forth rules and regulations that carry the force of law, as well as non-binding guidance. EPM's

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Speech Provision purports to summarize Arizona's voter intimidation laws. The Canvass Provision summarizes the Arizona Secretary of State's statutory duty to canvass—or, officially certify—the state's election results by a certain date. If a county fails to provide its official canvass to the Secretary by the state's canvassing deadline, the Secretary must canvass the statewide results without including the votes of individuals in the counties that missed the deadline. Plaintiffs alleged that the Speech Provision violates the First Amendment's Freedom of Speech Clause and the Fourteenth Amendment's Due Process Clause, and that the Canvass Provision is an unconstitutional burden on plaintiffs' right to vote.

The panel affirmed the district court's preliminary injunction enjoining the Speech Provision. Plaintiffs established standing by showing that they intend to engage in political and election-related speech, that the Speech Provision arguably proscribes that conduct, and that there is a credible or substantial risk of enforcement. Plaintiffs showed a likelihood of success on the merits given that the Secretary did not challenge on appeal the district court's conclusion that the Speech Provision, as interpreted by plaintiffs, likely violates the First and Fourteenth Amendments, and the district court correctly found that the constitutional avoidance canon was inapplicable. Plaintiffs satisfied the remaining factors necessary to obtain injunctive relief.

The panel agreed with the district court that *Pullman* abstention is inappropriate in this case, given the important First Amendment concerns implicated by the Speech Provision.

The panel reversed the district court's determination that plaintiffs have standing to challenge the Canvass Provision. Although the right to vote is a legally protected interest, and voter disenfranchisement is a concrete and particularized injury, plaintiffs failed to make a clear showing that a county would fail to timely canvass its election results, thereby triggering the Secretary's duty to canvass the state votes without including the votes in that county. It was therefore highly unlikely that the Canvas Provision would disenfranchise any Arizona voters. The panel therefore vacated the injunction as to that provision.

**COUNSEL**

Jonathan Riches (argued), Andrew Gould, Drew C. Ensign Dallin Holt, and Erica Leavitt, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Phoenix, Arizona; Michael D. Berry, America First Policy Institute, McKinney, Texas; Jessica H. Steinmann and Patricia Nation, America First Policy Institute, Washington, D.C.; for Plaintiffs-Appellees.

Joshua D. Bendor (argued), Solicitor General; Kyle Cummings and Karen J. Hartman-Tellez, Assistant Attorneys General; Nathan T. Arrowsmith, Luci D. Davis, Kara M. Karlson, Senior Litigation Counsel; Joshua M. Whitaker, Special Litigation Unit Chief; Office of the Arizona Attorney General, Phoenix, Arizona; for Defendants-Appellants.

## OPINION

WARDLAW, Circuit Judge:

To ensure efficient, uniform, and impartial election procedures, Arizona law requires the Arizona Secretary of State to publish an Election Procedures Manual ("EPM") every-odd numbered year immediately preceding the general election. A.R.S. § 16-452(B). The EPM sets forth rules and regulations that carry the force of law, as well as non-binding guidance on matters outside of the Secretary's authority to promulgate election regulations. At issue here are two provisions in the 2023 EPM. The first provision, the Canvass Provision, summarizes the Secretary's statutory duty to canvass—or, officially certify—the state's election results by a certain date. The provision specifies that if a county fails to provide its official canvass to the Secretary by the state's canvassing deadline, the Secretary must canvass the statewide results without including the votes of individuals in the counties that missed the deadline. *See* Ariz. Sec'y of State, 2023 Elections Procedure Manual 247–53. The second provision, the Speech Provision, purports to summarize Arizona's voter intimidation laws and provides examples of conduct which may be considered voter intimidation. In particular, the Speech Provision provides that "[a]ny activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited." *Id.* at 181 (citing A.R.S. § 16-1013).

America First Policy Institute ("AFPI"), American Encore,[1] and Karen Glennon ("Plaintiffs") brought suit against Arizona Secretary of State Adrian Fontes (the "Secretary"),[2] challenging these provisions as violative of the First and Fourteenth Amendments.  The district court agreed.  The court preliminarily enjoined enforcement of the Canvass and Speech Provisions, while denying the Secretary's motion to stay the case pursuant to *Pullman* abstention.  This appeal ensued.

We affirm the district court's grant of preliminary injunctive relief as to the Speech Provision, concluding that Plaintiffs have made a clear showing that they are likely to establish standing and that they have satisfied the factors necessary to obtain preliminary injunctive relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).  We also agree with the district court that *Pullman* abstention is inappropriate in this case given the important First Amendment concerns implicated by the Speech Provision.  *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941).  However, we reverse the district court's determination that Plaintiffs have standing to challenge the Canvass Provision.  We therefore vacate the injunction with respect to enforcement of the Canvass Provision.

---

[1] The district court dismissed American Encore as a plaintiff as to Count I of the complaint, and American Encore is not a party to this appeal.

[2] Plaintiffs also named as defendants Kris Mayes, the Arizona Attorney General (the "Attorney General"), and Katie Hobbs, the Governor of Arizona.  However, the district court dismissed the Attorney General as to Count I, and the parties agreed to dismiss the Governor as a party to the suit.

## I. Factual and Legal Background

### A. Legal Framework of the Election Procedures Manual

In addition to its statutory scheme regulating state elections, Arizona law charges its Secretary of State with prescribing "rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating and storing ballots." A.R.S. § 16-452(A). These rules must be published in "an official instructions and procedures manual," the "EPM," which is to be issued every "odd-numbered year immediately preceding the general election." A.R.S. § 16-452(B). Before issuance, the Secretary must consult with each county board of supervisors or other officer in charge of elections, and the EPM must be approved by the Governor and Attorney General. *Id.*

"Once adopted, the EPM has the force of law; any violation of an EPM rule is punishable as a class two misdemeanor." *Ariz. Pub. Integrity All. v. Fontes*, 475 P.3d 303, 308 (Ariz. 2020) (citing A.R.S. § 16-452(C)). The EPM also contains guidance on matters outside of the Secretary's statutory authority to promulgate election rules and regulations as prescribed in A.R.S. § 16-452(A). Guidance, such as candidate nomination procedures, *McKenna v. Soto*, 481 P.3d 695, 699 (Ariz. 2021), falls outside the mandates of A.R.S. § 16-452(A), and therefore does not carry criminal penalties as enforcement. *Id.*

At issue in this case are two provisions of the 2023 EPM: (1) Chapter 13, section II(B)(2)—the Canvass Provision; and (2) Chapter 9, section III(D)—the Speech Provision.

## B.  The Canvass Provision

Introduced in the 2023 EPM, the Canvass Provision details the scope of the Secretary's statutory duty to canvass.[3]  The relevant portion provides:

> The Secretary of State may postpone the canvass on a day-to-day basis for up to three days if the results from any county are missing. A.R.S. § 16-648(C). All counties must transmit their canvasses to the Secretary of State, and the Secretary of State must conduct the statewide canvass, no later than 30 days after the election. A.R.S. § 16-648(C). *If the official canvass of any county has not been received by this deadline, the Secretary of State must proceed with the state canvass without including the votes of the missing county (i.e., the Secretary of State is not permitted to use an unofficial vote count in lieu of the county's official canvass).*
>
> The Secretary of State has a non-discretionary duty to canvass the returns as provided by the counties and has no authority to change vote totals, reject the election results, or delay certifying the results without express statutory authority or a court order.

Ariz. Sec'y of State, 2023 Elections Procedure Manual 252 (emphasis added).    Arizona law places a statutorily

---

[3] "Canvass" refers to the process by which a jurisdiction officially certifies its election results.

mandated duty upon county officials to canvass election results by certain deadlines.  A.R.S. §§ 16-642, 648.

## C.  The Speech Provision

The Speech Provision purports to summarize rules to prevent voter intimidation.  Most relevant to this suit, the Speech Provision provides:

> Any activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited.

Ariz. Sec'y of State, 2023 Elections Procedure Manual 181(citing A.R.S. § 16-1013).  This section sought to summarize A.R.S. § 16-1013, which states:

> A.  It is unlawful for a *person knowingly*:
>
> 1.  Directly or indirectly, to make use of force, violence or restraint, or to inflict or threaten infliction, by himself or through any other person, of any injury, damage, harm or loss, or in any manner to practice intimidation upon or against any person, in order to induce or compel such person to vote or refrain from voting for a particular person or measure at any election provided by law, or on account of such person having voted or refrained from voting at an election.

A.R.S. § 16-1013 (emphasis added).

The Speech Provision further instructs that elections officials must utilize a marshal to preserve order and remove disruptive persons, and that the marshal should use his or her sound judgment to decide whether to contact law enforcement. *See* Ariz. Sec'y of State, 2023 Elections Procedure Manual 182. To assist election officials in spotting "potentially intimidating conduct" the Speech Provision provides the following examples:

- Aggressive behavior, such as raising one's voice or taunting a voter or poll worker;
- Using threatening, insulting, or offensive language to a voter or poll worker;
- Blocking the entrance to a voting location;
- Disrupting voting lines;
- Following voters or poll workers coming to or leaving a voting location, including to or from their vehicles;
- Intentionally disseminating false or misleading information at a voting location, such as flyers or communications that misstate the date of the election, hours of operation for voting locations, addresses for voting locations, or similar efforts intended to disenfranchise voters;
- Impersonating a law enforcement officer or otherwise wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters (*see also* A.R.S. § 26-170, prohibiting

> unauthorized wearing of national guard or U.S. armed forces uniform);
> - Directly confronting, questioning, photographing, or videotaping voters or poll workers in a harassing or intimidating manner, including when the voter or poll worker is coming to or leaving the polling location;

*Id.*

This language was initially introduced in the 2019 EPM. Relatively recently, however, on August 14, 2023, the Speaker of the Arizona House of Representatives and the President of the Arizona Senate submitted comments asserting that the Speech Provision violated Arizona statutory law, the First Amendment, and the Free Speech and Due Process clauses of the Arizona Constitution. The Secretary chose not to modify the 2023 EPM in response to these comments.

## II. Procedural Background

### A. Events Preceding This Suit

In February 2024, nonprofit corporations sued the Secretary in state court, challenging the Speech Provision. *See, e.g., Ariz. Free Enter. Club v. Fontes*, No. CV2024-002760 (Ariz. Super. Ct. Maricopa Cnty., filed Feb. 9, 2024).[4] AFPI joined one of these cases as a co-plaintiff.

---

[4] Other cases challenging aspects of the 2023 EPM have also been filed in the Arizona state courts. *See Petersen v. Fontes*, No. CV2024-001942 (Ariz. Super. Ct. Maricopa Cnty., filed Jan. 31, 2024); *Republican Nat'l Comm. v. Fontes*, No. CV2024-050553 (Ariz. Super. Ct. Maricopa Cnty., filed Feb. 9, 2024).

And in May 2024, AFPI sent a letter to the Attorney General and the Secretary requesting that they "disavow" enforcement of the Speech Provision to the extent it differs from the underlying criminal laws that it purports to summarize. Specifically, AFPI sought confirmation that "*all* relevant prosecutions for alleged threatening, harassing, intimidating, or coercing conduct as it relates to voting would be brought under A.R.S. §§ 16-1013 and 1017 or other applicable statutes, and not under A.R.S. § 16-452(C) for alleged violations of the 2023 EPM's Speech Restriction."

On May 31, 2024, the Attorney General responded in a letter that "[t]he portion of the EPM that [AFPI] label[s] as the 'Speech Restriction,' EPM, Chapter 9, section III.D, does not itself restrict or criminalize anything." Rather, it provides examples of, but "does not amend or otherwise expand," A.R.S. § 16-1013. Furthermore, the Attorney General confirmed that he "d[id] not view the EPM as broadening the scope of conduct criminally prohibited under A.R.S. §§ 16-1013, 1017 or relevant and applicable criminal statutes." In sum, the Attorney General confirmed that:

> Yes, all relevant prosecutions by our office of people who are not election officials for the conduct you describe–alleged threatening, harassing, intimidating, or coercing conduct as it relates to voting–would be brought under A.R.S. §§ 16-1013 and -1017 or other applicable statutes, and not under A.R.S. § 16-452(C) for alleged violations of what

you refer to as the 2023 EPM's "Speech Restriction."

However, the Attorney General noted that county prosecutors may also enforce the provision in A.R.S. §§ 16-1013, -1017, and -452(C) as they relate to voting and elections.

In a separate letter, dated the same day, the Secretary responded that "[i]n light of the Attorney General's letter and because the Secretary does not enforce criminal laws, the Secretary views the concerns raised in your May 21 letter as having been addressed."

### B. This Case

On July 8, 2024, Plaintiffs filed their complaint, contending that: (1) the Speech Provision violates the Freedom of Speech Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment; and (2) the Canvass Provision is an unconstitutional burden on Plaintiffs' right to vote.

Then, on July 18, 2024, American Encore, Karen Glennon, and Arizona Free Enterprise Club wrote to the Secretary requesting that he "unequivocally and specifically disavow all enforcement of the [Canvass Provision of the 2023 EPM] for the 2024 general election." On July 31, 2024, the Secretary responded that "the Secretary has a nondiscretionary statutory duty to canvass without delay, which the Canvass Provision reflects." Thus, the July 18 letter "in effect asks the Secretary to disavow this nondiscretionary statutory duty, which the Secretary cannot and will not do."

Shortly thereafter, Plaintiffs moved for preliminary injunctive relief against enforcement of the Speech and Canvass Provisions. The Secretary opposed the motion, moved to stay Plaintiffs' challenge to the Speech Provision in light of parallel state court challenges to the Speech Provision, and moved to dismiss both challenges under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

The district court first held that Plaintiffs had standing to challenge the Canvass and Speech Provisions, rejecting the Secretary's arguments that Plaintiffs failed to show a substantial risk of harm and that Plaintiffs' claims incorrectly understood the Provisions. Second, the district court denied the Secretary's motion to stay the case pending the resolution of the parallel state cases, concluding that *Pullman* abstention is "rarely" appropriate in First Amendment cases. Finally, the district court found that Plaintiffs had satisfied the *Winter* factors, warranting a preliminary injunction against enforcement of both provisions.

## III.   Standard of Review

We review "a district court's grant or denial of a preliminary injunction for an abuse of discretion." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 635 (9th Cir. 2015). "This review is limited and deferential, and it does not extend to the underlying merits of the case." *Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009) (quotations omitted). "A district court necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Id.* at 1078–79 (quotations omitted). We review a district court's determination that a plaintiff has standing de

novo. *Lopez v. Candaele*, 630 F.3d 775, 784–85 (9th Cir. 2010).

When reviewing a district court's decision on whether to invoke *Pullman* abstention, we apply a modified abuse of discretion standard. *Courthouse News Serv. v. Planet*, 750 F.3d 776, 782 (9th Cir. 2014). "We first review de novo whether the requirements for *Pullman* abstention are satisfied." *Id.* "If they are not, the district court has 'little or no discretion' to abstain; if they are, we review the decision to abstain for an abuse of discretion." *Id.* (citation omitted).

## IV. Preliminary Injunction

### A. Standing

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). To satisfy the "Cases" and "Controversies" requirement, a plaintiff must have standing to sue. *See Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019). "The doctrine of standing 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong' and 'confines the federal courts to a properly judicial role.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 338 (2016)).

In turn, "[t]o establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at 380. "The party invoking federal jurisdiction bears the burden of establishing these

elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

"[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* Thus, "[a]t the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citations and quotations omitted); *see also L.A. All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956–57 (9th Cir. 2021) ("At the preliminary injunction stage, the plaintiffs must make a clear showing of each element of standing, . . . relying on the allegations in their complaint and whatever other evidence they submitted in support of their [preliminary-injunction] motion to meet their burden." (alteration in original) (citations and quotation marks omitted)).

Furthermore, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Accordingly, Plaintiffs must show that they have standing to challenge both the Canvass and Speech Provisions.

Finally, "standing . . . is distinct from the merits of [a] claim." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). The Supreme Court has long instructed that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("As we stated in *Bell v. Hood*, 327 U.S. 678, 682 (1946),

'[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.'"). Thus, "[f]or standing purposes, we accept as valid the merits of [Plaintiffs'] legal claims." *Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 298 (2022).

Consistent with these principles, we have been careful to avoid adjudicating merits issues at the standing phase. *See, e.g.*, *Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1189 (9th Cir. 2023) ("That petitioners' theory may fail on the merits does not mean petitioners lack standing to raise it." (collecting cases)). Thus, at the standing phase, when the parties dispute the correct construction of a statute—*e.g.*, one arguing that it applies and the other asserting it does not—and that dispute goes to the merits of the plaintiff's claim, we accept the plaintiff's construction so long as it is arguable. *See Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022) ("Viewing the Offset Provision through Arizona's eyes, we must accept—for standing purposes—its allegations that the condition is unconstitutionally ambiguous and coercive."); *Steel Co.*, 523 U.S. at 89 ("[T]he district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another, . . . unless the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." (citation omitted)).

In sum, reviewing de novo, we ask—accepting the merits of Plaintiffs' claims—whether they have made a clear showing that they are likely to satisfy the threshold

requirements of standing for their challenges against each provision of the EPM.  We review each in turn.

### 1.  *The Canvass Provision*

The Secretary contends that Plaintiffs have not made the clear showing of standing required to challenge the Canvass Provision.  We agree with the Secretary that Plaintiffs have failed to make a clear showing that they are likely to suffer an injury-in-fact, and we accordingly vacate the preliminary injunction as to the Canvass Provision.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).

Plaintiffs contend that the enforcement of the Canvass Provision would have "the effect of disenfranchising every voter in any county that does not timely certify its election result with the Secretary."[5]  There is no doubt that the right to vote is a legally protected interest, and voter disenfranchisement is a concrete and particularized injury. [6] *See Burdick v. Takushi*, 937 F.2d 415, 417–18 (9th Cir. 1991) (concluding that threats to "rights as a voter to freedom of expression and association" demonstrated an

---

[5] Plaintiffs also advanced a theory of standing based on the existence of the Canvass Provision, contending that the Canvass Provision effectively transforms the right to vote from unconditional to conditional.  The district court rejected this theory of standing, and Plaintiffs do not advance it here.

[6] The Secretary does not contest that Plaintiffs allege the invasion of a legally protected interest; nor does he meaningfully contest that Plaintiffs' disenfranchisement would constitute a concrete and particularized injury.

"actual or threatened injury"). Thus, the parties primarily dispute whether the risk of disenfranchisement here is "actual or imminent" as opposed to "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks omitted). "A plaintiff threatened with future injury has standing to sue 'if the threatened injury is certainly impending, or there is a 'substantial risk that the harm will occur.'" *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (citations and quotation marks omitted); *see also Murthy*, 603 U.S. at 49–50 ("To establish standing, the plaintiffs must demonstrate a substantial risk that, in the near future, they will suffer an injury that is traceable to a Government defendant and redressable by the injunction they seek."). At the preliminary injunction stage, "[P]laintiffs must proffer evidence that the defendants' allegedly wrongful behavior w[ould] *likely* occur or continue." *Murthy*, 603 U.S. at 69 (alteration and emphasis in original) (citation and quotation marks omitted).

The Secretary is unquestionably under a statutorily mandated duty to "enforce" the Canvass Provision, *i.e.* canvass the state's election results by the State Canvass Deadline. However, Plaintiffs would suffer injury (disenfranchisement) *only if* the county in which they voted failed to certify its election results by the State's Canvass Deadline. Indeed, the parties agree that Plaintiffs would be injured by enforcement of the Canvass Provision only where: (a) a county election official fails to comply with his duty to certify the County's election results by the State Canvass Deadline; and (b) the Secretary fails to intervene—contrary to what he did with Cochise County in 2022—and force county officials to comply with their mandatory, statutory duty.

Thus, in considering whether Plaintiffs' injuries are actual or imminent, we must evaluate the likelihood that a county would fail to canvass its election results. *See Murthy*, 603 U.S. at 69. On this record, Plaintiffs fail to make a clear showing that it is more than hypothetical or conjectural that a county would fail to timely canvass its election results, thereby triggering the Secretary's duty to canvass the state votes without including the votes in that county.

As an initial matter, Plaintiffs fail to point to any specific county or election where county officials are likely to violate their mandatory duty to certify the county's election results on time. Plaintiffs rely on the 2022 general election where the Cochise County Board of Supervisors refused to certify the county's election results as evidence that county officials may violate their mandatory duty. But the isolated case of Cochise County in 2022 cannot by itself support standing for injunctive relief. *See id.* at 59 ("[P]ast injuries are relevant only for their predictive value." (citing *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief"))); *see also City of L.A. v. Lyons*, 461 U.S. 95, 105–10 (1983).

Furthermore, Plaintiffs fail to make a clear showing that the events in Cochise County are *likely* to occur again. Under Arizona law, county officials are under a duty to canvass election results. *Crosby v. Fish*, 563 P.3d 143, 148 (Ariz. Ct. App. 2025). And the failure to comply with this duty may form the basis for criminal sanctions. *Id.* 148–50. Indeed, the Cochise County Board members who failed to certify the 2022 election are currently under criminal prosecution for their failure to timely certify the county's election results. *See id.* at 146–47;

To support their view that the events of Cochise County are not "an isolated incident," Plaintiffs point to a handful of news articles as evidence that: (1) in the 2024 election cycle "a member of the Pinal County Board indicated he may not certify the 2024 primary results"; and (2) election officials across the country "are threatening to withhold certification because of 'election integrity.'"  However, when read in context, neither of these articles clearly shows that the events of Cochise County are likely to re-occur.  The Pinal County Board member who threatened not to certify results ultimately did so after voicing concerns about the election results.  And Plaintiffs' second article notes that despite some local officials declining to certify election results, "[i]n every such case, after intervention by state officials or the courts, the election was certified."  Indeed, the article goes on to note that Arizona has "taken steps since 2020 to explicitly clarify that local officials cannot legally refuse to certify election results, and to spell out potential consequences if they try, including criminal charges."[7]

Even if Plaintiffs had shown the likelihood that a county would fail to timely certify its election results, Plaintiffs provide no evidence to undermine the intuitive conclusion that some other statutorily bound entity would intervene to require compliance, as the Secretary did just that in 2022 with Cochise County.  As the district court and parties recognize, a state court mandamus action would also resolve the issue and avoid the disenfranchisement that the Canvass Provision otherwise threatens.

---

[7] We cite these authorities only to show that, on the record before the district court, Plaintiffs did not clearly show that it was likely that a county would fail to timely certify its election results.  Of course, a different record could yield a different outcome.

And standing to seek mandamus relief, under Arizona law, is not limited to the Secretary, who "has committed to using all lawful means to ensure" that voters would not be disenfranchised under the scenario contemplated by the Canvass Provision. Arizona law, "allows a party beneficially interested in an action to compel a public official to perform an act imposed by law." *Ariz. Pub. Integrity All.*, 475 P.3d at 307 (quotation marks omitted). Thus, Arizona citizens and voters may "seek to compel [a county official] to perform his non-discretionary duty to . . . comply with Arizona law." *Id.* Therefore, to demonstrate that their injury is actual or imminent, Plaintiffs would also need to show that it is likely that the Secretary or any other "beneficially interested" party would fail to bring a mandamus action in time to avoid disenfranchisement.

This is the type of "long chain of hypothetical contingencies" and "conjectural allegations of potential injuries," which we have held to be insufficient to create a "substantial risk" of harm. *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2023) (citations and quotation marks omitted). At bottom, too many hypothetical wrongs must occur before Plaintiffs would suffer disenfranchisement: county officials would have to violate their statutorily mandated duty to certify the vote, and both the Secretary and any beneficially interested parties would need to decline to seek mandamus or other relief. Together with the threat of criminal prosecution, *see Crosby*, 563 P.3d at 148, these contingencies make it highly unlikely that the Canvass Provision would disenfranchise any Arizona voters.

### 2. The Speech Provision

Turning to Plaintiffs' First Amendment challenge, the Secretary contends that Plaintiffs lack standing because they

have failed to show a specific or credible threat of enforcement of the Speech Provision against them.

We have long recognized that "First Amendment cases raise 'unique standing considerations,' . . . that 'tilt[ ] dramatically toward a finding of standing.'" *Lopez*, 630 F.3d at 781 (first quoting *Ariz. Right to Life Pol. Action Comm. v. Bayless,* 320 F.3d 1002, 1006 (9th Cir. 2003); then quoting *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1155 (9th Cir. 2000)). This is because "a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of L.A, Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013); *see also Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) ("Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights.").

However, "self-censorship alone is insufficient to show injury." *Lopez*, 630 F.3d at 792; *see also Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."). Nor does "the mere existence of a proscriptive statute [or] a generalized threat of prosecution satisf[y] the 'case or controversy' requirement." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc).

Instead, a plaintiff's self-censorship must be reasonably premised on a credible or substantial risk that the law in question will be enforced against him. *See id.* ("[T]here must be a genuine threat of imminent prosecution.") (citation and quotation marks omitted); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010) ("[W]here a plaintiff has refrained from engaging in expressive activity

for fear of prosecution under the challenged statute, such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced.") (quotation marks omitted); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.") (citations and quotation marks omitted).

Thus, in evaluating a pre-enforcement challenge, we look to whether the plaintiff has shown "[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed by a statute, and [3] there exists a credible threat of prosecution thereunder." *See Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024) (alterations in original) (quoting *Driehaus*, 573 U.S. at 159).[8]

### a. Intent To Engage In Conduct Arguably Affected With A Constitutional Interest

First, the Secretary contends that Plaintiffs have failed to adequately specify the conduct in which they intend to engage. However, both the complaint and the declarations submitted by Plaintiffs discuss past expressive conduct engaged in by various Plaintiffs. AFPI is regularly involved in election related activity and supports and opposes

---

[8] Prior to *Driehaus*, we articulated our own factors in evaluating a plaintiff's standing to bring a pre-enforcement challenge, the essence of which is partially incorporated in *Driehaus*'s framework. *See Thomas*, 220 F.3d at 1139; *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). And although we have "toggled between these tests," we apply the *Driehaus* framework, incorporating the relevant elements of our own precedent. *Id*.

legislation by speaking to voters, and intends to continue to do so in future election cycles. AFPI also engages in electioneering activities, trains volunteers and poll watchers before and during election day, conducts grassroots workshops, and regularly communicates with voters.

Plaintiffs have also submitted declarations specifying the types of speech and conduct they regularly engage in, which appear to violate the Speech Provision. Plaintiff Glennon declares that she "regularly discuss[es] politics, voting, and many government-related topics with people" and that because of the Speech Provision, "this political and election-related speech that I regularly engage in is now subject to criminal prosecution." Similarly, Plaintiff AFPI works on issues relating to legislation and public policy and promotes voting and awareness of important issues. This work includes training volunteers and poll watchers on election integrity laws, issues at polling locations before elections, and compliance with the EPM. AFPI asserts that it is "gravely concerned" that speech that may have the effect of offending someone "may now be subject to criminal liability" because of the Speech Provision, and "that one of its volunteers or poll-workers might, in genuine good faith, say something that . . . has the 'effect' of offending someone." Further, AFPI explains that its members routinely advocate for governmental policies, which may also have the effect of offending someone. Consequently, AFPI contends that it and its members must now chill their own speech to avoid criminal sanctions in Arizona. AFPI's declaration also gives specific examples of speech that is covered by the Speech Provision, *e.g.*, "[a]n 'All Lives Matter' hat; [a] shirt that says 'Vote to Protect Unborn Children'; . . . and [a] hoody that reads 'Israel has a right to exist' or 'Never forget October 7th.'"

We have explained that "[t]he concept of 'intention' is more counterfactual than practical.  That is to say, courts must ask whether the plaintiff would have the intention to engage in the proscribed conduct, were it not proscribed." *Peace Ranch, LLC*, 93 F.4th at 488.  And here it is clear that Plaintiffs intend to engage in political and election-related speech of whatever nature the times and issues demand[9]— speech that is protected by the First Amendment.

Although Plaintiffs do not state the exact nature of the political speech in which they intend to engage in the next election, that they will engage in First Amendment speech is sufficient given the vagueness and overbreadth of the Speech Provision itself.    The Speech Provision's purported prohibition on activity that has the "effect" of "threatening, harassing, intimidating, or coercing voters" could conceivably reach any speech related to elections and politics, rendering Plaintiffs' self-censorship reasonably premised on a credible and substantial risk of prosecution. *See HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1217 (11th Cir. 2025) ("[T]he Act's vagueness makes Hamburger Mary's self-censorship more reasonable.   A speech restriction's 'imprecision exacerbates its chilling effect.' . . . This consequence of vague speech laws of course implicates their constitutionality . . . . And it also affects our self-censorship standing analysis by making a broader range of self-censorship a 'reasonable' response.") (citations omitted); *Kenny v. Wilson*, 885 F.3d 280, 291 (4th Cir. 2018) ("[I]t is precisely because the statutes are so vague that plaintiffs can't be more specific.  Plaintiffs allege that

---

[9] The 2024 election cycle has passed, and the issues and candidates for the next election cycle are not yet teed up sufficiently to specify in which particular speech or advocacy Plaintiffs intend to engage.

they can be criminally prosecuted for just about any minor perceived infraction and that they can't predict the type of conduct that will lead to an arrest.").

Indeed, it is inherent in the very nature of political and electoral expressive conduct that Plaintiffs may not know which political issues may become relevant or offensive at the polls. And it is inevitable that some political and election speech—matters of public concern—will have the effect of being offensive to someone. As the Supreme Court stated in *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 51 (1988) (citation omitted):

> The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are 'intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.' . . . Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to 'vehement, caustic, and sometimes unpleasantly sharp attacks.'

*See also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 301 (1979) ("Although appellees do not plan to propagate untruths, they contend—as we have observed— that 'erroneous statement is inevitable in free debate'") (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964)). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the

expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).     And "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful*." Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

Accordingly, Plaintiffs have sufficiently shown that they intend to engage in a course of conduct arguably affected by a constitutional interest—namely, political and election-related speech.

### b.   Proscribed By Law

Second, the district court properly rejected the Secretary's view that Plaintiffs' proposed speech is not prohibited by the Speech Provision because under his interpretation of the Speech Provision it merely summarizes existing criminal law.  A plaintiff must only show that their "future conduct . . . [is] 'arguably . . . proscribed by [the] statute' it wishes to challenge." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 489 (9th Cir. 2024*)* (alterations in original) (quoting *Driehaus*, 573 U.S. at 162).  And for the purposes of standing, we accept Plaintiffs' interpretation of the statute so long as it is an arguable interpretation.  *See Yellen*, 34 F.4th at 850.[10]

---

[10] The Secretary contends that the district court erred in accepting Plaintiffs' construction of the Speech Provision because: (1) *Yellen*, on which the district court relied in holding that it must accept Plaintiffs' reading, was decided at the motion to dismiss stage; (2) it is well-established that we accept a party's factual *not* legal conclusions. However, we have extended *Yellen*'s holding to the preliminary injunction context.  *See Isaacson v. Mayes*, 84 F.4th 1089, 1095, 1097 (9th Cir. 2023).  Furthermore, *Warth*'s instruction that "standing in no

Here, Plaintiffs provide a reasonable interpretation of the Speech Provision—that it adds new criminal prohibitions as opposed to summarizing the existing voter-intimidation statutes—based on the substantial variance between the Speech Provision's summary of A.R.S. § 16-1013 and the actual text of A.R.S. § 16-1013.  A.R.S. § 16-1013 provides:

> A.  It is unlawful for a *person knowingly*:
>
> 1.  Directly or indirectly, to make use of force, violence or restraint, or to inflict or threaten infliction, by himself or through any other person, of any injury, damage, harm or loss, or in any manner to practice intimidation upon or against any person, *in order to induce or compel such person to vote or refrain from voting* for a particular person or measure at any election provided by law, or on account of such person having voted or refrained from voting at an election.    A.R.S. § 16-1013 (emphasis added).

By contrast, the Speech Provision provides that:

> Any activity by a person with the intent *or effect of threatening, harassing, intimidating,*

---

way depends on the merits," 422 U.S. at 500, did not rely on the fact that the case was at the motion to dismiss stage, *see id.* at 501 (noting as a "further preliminary matter . . . [that] [f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint."). And we are not, here, reaching legal conclusions—we only ask whether Plaintiffs' interpretation is sufficiently arguable to confer standing.

> *or coercing voters* (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited. A.R.S. § 16-1013.

Ariz. Sec'y of State, 2023 Elections Procedure Manual 181 (emphasis added). And it includes a number of examples of "potentially intimidating conduct" such as "[u]sing threatening, insulting, or *offensive* language to a voter or poll worker." *Id.* at 182 (emphasis added).

The Speech Provision's broad language substantially differs from A.R.S. § 16-1013 in three aspects. First, it broadens the mens rea requirement in A.R.S. § 16-1013's from "knowingly" engaging in the prohibited conduct to engaging in any activity with the "*effect* of threatening, harassing, intimidating, or coercing voters." And, as the examples in the Speech Provision demonstrate, this prohibition could encompass speech that has the effect of "insulting[] or offending" an individual. Second, the Speech Provision excludes the element that actions must be taken to "induce or compel such person to vote or refrain from voting." Thus, even conduct that does not impact a voter's vote may be prohibited. Finally, it includes the undefined term "harassing," which may also encompass a broad range of activities that are viewed as insulting or offensive. In sum, the Speech Provision's "summary" reaches conduct beyond the confines of A.R.S. § 16-1013. And Plaintiffs' intended speech—political and electoral speech—arguably falls within the Speech Provision's purported prohibition.

Furthermore, Plaintiffs have sufficiently shown that under A.R.S. § 1642(C) a violation of the Speech Provision may constitute a misdemeanor. Only those rules which fall within the topics enumerated in A.R.S. § 16-452(A) can be

criminally punished. *McKenna v. Soto*, 481 P.3d 695, 699 (Ariz. 2021). Section 16-452(A) requires the Secretary to prescribe rules to "achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency *on the procedures for early voting and voting.*" A.R.S. § 16-452(A) (emphasis added). Here, Plaintiffs assert that the Speech Provision falls under the ambit of A.R.S. § 16-452(A) because it is a rule that addresses the procedure for "voting." This is an arguable reading, which satisfies our standing inquiry.

But even if the Speech Provision sits outside of the ambit of A.R.S. § 16-452(A), and is not backed by criminal prohibition, it likely still creates a chilling effect on First Amendment conduct. The EPM is designed to provide a uniform set of rules and guidance for election officials. A.R.S. § 16-452(A). The Speech Provision and its corresponding examples were intended to be used by election officials to identify and "promptly remedy" any conduct that could be viewed as voter intimidation. Ariz. Sec'y of State, 2023 Elections Procedure Manual 181. Thus, Plaintiffs may be dissuaded from engaging in their intended speech even if there is no threat of criminal prosecution, because election officials may nonetheless report them to police or remove them from the polling location based on guidance provided in the EPM. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) ("The Response Team's ability to make referrals—*i.e.*, to inform [the Office of Student Conflict Resolution] or the police about reported conduct—is a real consequence that objectively chills speech."); *White v. Lee,* 227 F.3d 1214, 1228 (9th Cir. 2000) ("Informal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,' can violate the First Amendment also."

(quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)); *cf. Minnesota Voters All. v. Mansky*, 585 U.S. 1, 21 (2018) ("[A]n election judge's own politics may shape his views on what counts as 'political.' And if voters experience or witness episodes of unfair or inconsistent enforcement of the ban, the State's interest in maintaining a polling place free of distraction and disruption would be undermined by the very measure intended to further it."). Accordingly, Plaintiffs have sufficiently shown that their intended conduct is arguably proscribed by the Speech Provision, supporting the reasonableness of their self-censorship.

### c. Credible Or Substantial Threat Of Prosecution

Finally, we reject the Secretary's contention that Plaintiffs have failed to make a clear showing of a credible or substantial threat of prosecution.

In determining whether a plaintiff has shown a credible or substantial threat of enforcement, we have identified a number of factors that may support the reasonableness of a plaintiff's fear of prosecution. These include: (1) "whether the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,'" *Tingley*, 47 F.4th at 1067 (citation omitted); (2) whether the enforcing authority has disavowed enforcement, *LSO, Ltd*, 205 F.3d at 1154–56; and (3) "whether there is a 'history of past prosecution or enforcement,'" *Tingley*, 47 F.4th at 1067 (citation omitted). Ultimately, the touchstone of our inquiry is whether Plaintiffs have adduced enough evidence to show that there is a realistic threat that the law in question may be enforced against them.

First, though enforcement authorities have not "communicated a specific warning or threat to initiate

proceedings," *id.* at 1067, the Secretary's failure to modify the Speech Provision in response to Arizona assembly members' concerns that, as written, the Provision runs afoul of the First Amendment, reasonably indicates an intent to enforce the Provision.

Second, although the Attorney General disavowed Plaintiffs' interpretation of the Speech Provision, even assuming the Attorney General will not criminally prosecute conduct beyond the criminal conduct set forth in the statute, A.R.S. § 16-1013, Plaintiffs have still shown a credible threat of adverse government action by virtue of the enforcement authority delegated by the Secretary to election workers. In evaluating the threat of enforcement, we look to "the threat posed *collectively* by the entire 'universe of potential complainants.'" *Matsumoto v. Labrador*, 122 F.4th 787, 798 (9th Cir. 2024) (emphasis in original) (citing *Driehaus*, 573 U.S. at 164). The Secretary charges election workers with the responsibility to "prevent and promptly remedy any instances of voter intimidation." Ariz. Sec'y of State, 2023 Election Procedure Manual 181. To fulfill that duty election poll workers must "preserve order and remove disruptive persons from the voting location." *Id.* at 182. The Secretary instructs election poll workers to enforce the EPM at polling stations and to rely upon the Speech Provision in assessing whether to call the police or permit individuals in or around the polling place. *Id.* Indeed, the potential for poll workers to expose individuals to arrest or have them removed from the voting location for exercising First Amendment speech that others find offensive creates its own chilling effect. Ariz. Sec'y of State, 2023 Elections Procedure Manual 181. *See Speech First*, 939 F.3d at 765; *White v. Lee,* 227 F.3d at 1228; *cf. Mansky*, 585 U.S. at 21.

This presents enough of a collective threat to create a credible or substantial risk of enforcement.

In sum, Plaintiffs have shown that there is a credible or substantial risk of enforcement of the Speech Provision against them.  Poll workers may call the police or remove individuals from voting centers based on the Speech Provision alone.  With this threat and considering the increasingly contentious elections our country has experienced over time, Plaintiffs satisfy this showing.

## B.  *Winter* Factors

Next the Secretary contends that Plaintiffs failed to satisfy the four-factor test for preliminary injunctive relief as outlined in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Under the *Winter* test, a party is entitled to a preliminary injunction if it demonstrates (1) 'that [it] is likely to succeed on the merits,' (2) 'that [it] is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'that the balance of equities tips in [its] favor,' and (4) 'that an injunction is in the public interest.' *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (alterations in original) (quoting *Winter*, 555 U.S. at 20).  "[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.  The Secretary challenges Plaintiffs' showing on each factor, and we review each in turn, concluding that the district court did not abuse its discretion in finding that Plaintiffs had satisfied each factor.

### 1.  *Likelihood Of Success On The Merits*

"Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Env't Prot. Info.*

*Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011), *overruled on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019).

The district court found this factor met, concluding that: (1) the Speech Provision did not summarize the existing voter-intimidation statutes; (2) the Speech Provision likely violated the First Amendment; and (3) the Speech Provision was likely unconstitutionally vague. On appeal, the Secretary does not challenge the district court's conclusion that the Speech Provision, as interpreted by Plaintiffs, likely violates the First and Fourteenth Amendments. Accordingly, the Secretary has forfeited any arguments as to these aspects of the district court's ruling. *See Wolford v. Lopez,* 116 F.4th 959, 991 (9th Cir. 2024). Instead, the Secretary focuses on what he contends to be the correct construction of the Speech Provision, asserting that the Speech Provision is no more than "an attempt to summarize criminal prohibitions created by the [Arizona] Legislature." He urges us to apply the constitutional avoidance canon of construction to read the Speech Provision narrowly and decline Plaintiffs' interpretation of it.

Under this canon, we "may interpret 'ambiguous statutory language' to 'avoid serious constitutional doubts.'" *Iancu v. Brunetti*, 588 U.S. 388, 397 (2019) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)). "But that canon of construction applies only when ambiguity exists." *Id.* Here, the text of the Speech Provision is

unambiguous—it prohibits "[a]ny activity by a person with the . . . effect of threatening, harassing, intimidating, or coercing voters." Reading the more limiting language in A.R.S. § 16-1013 into the Speech Provision directly conflicts with the clear and broad language of the Speech Provision—a reformulation that we cannot do. "We will not rewrite a law to conform it to constitutional requirements." *Iancu*, 588 U.S. at 397 (citation omitted). Accordingly, the district court correctly found that the constitutional avoidance canon was inapplicable. And the Secretary does not challenge Plaintiff's First Amendment claim, as they construe the Speech Provision. Plaintiffs have therefore demonstrated a likelihood of success on this claim.

## 2. *The Remaining Winter Factors*

Because Plaintiffs have shown a likelihood of success on the merits with respect to their First Amendment challenge, the remaining factors are also met. We have held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Associated Press v. Otter,* 682 F.3d 821, 826 (9th Cir. 2012). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Bev. Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc) (citation omitted).

Nonetheless, the Secretary contends that Plaintiffs failed to show irreparable harm because the Speech Provision had been part of the EPM since 2019 and that Plaintiffs' purported delay in bringing their lawsuit belies their claim of irreparable injury. However, the district court reasonably concluded that Plaintiffs were not unjustifiably delayed given that they discovered the Speech Provision in 2023— when members of the Arizona Legislature publicly

expressed First Amendment concerns—and brought suit several months after the Secretary published the 2023 EPM.

Moreover, we reject the Secretary's contention that an injunction is not in the public interest given the State's strong interest in "protecting the ability of voters to vote safely and securely, free of intimidation." Vindication of constitutional rights "is always in the public interest." *Am. Bev. Ass'n*, 916 F.3d at 758. And it is doubtful that the district court's injunction diminishes the States' ability to protect voters from intimidation, given that the underlying statutes it purports to summarize remain in effect notwithstanding the injunction against the Speech Provision.

The Secretary also contends that the district court should have refrained from enjoining the provision because, in a separate case, an Arizona trial court already enjoined the Secretary and Attorney General from enforcing the Speech Provision. However, the district court correctly rejected the Secretary's argument that "[t]he public interest is not served by having a duplicative federal injunction on the same subject." The Secretary points to no authority that holds that issuing a duplicative injunction is a bar to preliminary injunctive relief. Indeed, district courts frequently issue overlapping preliminary injunctions on the same subject matter. *See, e.g.*, *California v. Health & Hum. Servs.*, 390 F. Supp. 3d 1061, 1065–66 (N.D. Cal. 2019) ("[O]verlapping injunctions appear to be a common outcome of parallel litigation, rather than a reason for the Court to pass on exercising its duty to determine whether litigants are entitled to relief." (collecting cases)).

Finally, we reject the Secretary's contention that the *Purcell* doctrine counsels against preliminary injunctive relief in this case. Under *Purcell*, "federal courts should

ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (citing 549 U.S. 1 (2006) (per curiam)). *Purcell* prevents "the uncertainty engendered by judicial disruptions to the status quo in the midst of elections [that] can and often will cause eligible voters to remain away from the polls." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 985 (9th Cir. 2024). It aims to ensure that "[w]hen an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (Mem) (2022) (Kavanaugh, J., joined by Alito, J., concurring). Only "under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress" is *Purcell* implicated. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). Moreover, "*Purcell* did not set forth a *per se* prohibition against enjoining voting laws on the eve of an election . . . . Rather, courts must assess the particular circumstances of each case in light of the concerns expressed by the *Purcell* court to determine whether an injunction is proper." *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 368 (9th Cir. 2016).

We conclude that "the factors that animated the Supreme Court's concern in *Purcell* are not present" here. *Feldman*, 843 F.3d at 368. First, the enjoined provision—the Speech Provision—"does not affect the state's election processes or machinery." *Id*. at 409. Instead, the Speech Provision regulates the type of speech and conduct that individuals may engage in around voting places. Thus, "unlike the circumstances involved in *Purcell* . . ., the injunction at issue here does not involve any change at all to the actual election process." *Id.* In addition, it is not clear that the injunction would disturb the status quo or impose a significant hardship

on the State.  *See id.* (noting that a third reason why *Purcell* does not apply is because the injunction did not "disrupt long standing state procedures"); *see also Merrill,* 142 S.Ct. at 881 (noting that the *Purcell* principle might be overcome where, among other things, "the changes in question are at least feasible before the election without significant, cost, confusion, or hardship."); *compare Mi Familia Vota*, 111 F.4th at 985 ("Elections officials are now subject to conflicting criminal penalties, orders, and policies. Identically situated voter registration applicants are treated differently depending on the voter registration application form they pick up.").

The Secretary's position is that the Speech Provision codified only existing law, which remains enforceable and which the Attorney General and Secretary have stated are the main enforcement mechanisms to deal with voter intimidation.  And the record does not reveal a single prosecution under the Speech Provision exclusively.  Thus, it is unclear how enjoining the Speech Provision would disturb the status quo or visit a hardship on election authorities since the main enforcement mechanism—the underlying statute—remains in force.

Accordingly, we affirm the district court's grant of preliminary injunctive relief with respect to the Speech Provision.

## V.  *Pullman* **Abstention**

Finally, the Secretary contends that the district court erred by declining to abstain under the doctrine of *Pullman* abstention.  "Under the *Pullman* abstention doctrine, 'federal courts have the power to refrain from hearing cases' when 'the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to

interpret ambiguous state law.'" *Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916, 926 (9th Cir. 2024) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716–17 (1996)).  The doctrine "is intended both to avoid 'a collision between the federal courts and state . . . legislatures, . . . and to prevent 'the premature determination of constitutional questions.'"  *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003) (first alteration in original) (citations omitted).  It "does not exist for the benefit of either of the parties but rather for the rightful independence of the state governments and for the smooth working of the federal judiciary." *Courthouse News Serv.*, 750 F.3d at 783 (citations omitted).

A district court does not have the authority to exercise its discretion to abstain under *Pullman*, unless three independently mandated requirements are met:

> (1) the case touches on a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to its adjudication is open, (2) constitutional adjudication plainly can be avoided if a definite ruling on the state issue would terminate the controversy, and (3) the proper resolution of the possible determinative issue of state law is uncertain.

*Id.* at 783–84.

*Pullman* abstention is an "extraordinary and narrow exception to the duty of a . . . court to adjudicate a controversy."  *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 528 (9th Cir. 2015) (alteration in original) (en banc) (citation omitted).  And it is "rarely appropriate for a federal court to abstain under

*Pullman* in a First Amendment case." *Id.* (citation omitted). This is "because the guarantee of free expression is always an area of particular federal concern," *Courthouse News Serv.*, 750 F.3d at 784 (citation omitted), and "the delay that comes from abstention may itself chill the First Amendment rights at issue," *Porter*, 319 F.3d at 492–93. Accordingly, "[w]e have held that, in First Amendment cases, the first *Pullman* factor will almost never be present because the guarantee of free expression is always an area of particular federal concern." *Id.* at 492 (citation omitted).

Indeed, to date, we have found the first *Pullman* requirement satisfied in the First Amendment context only once. *See Almodovar v. Reiner*, 832 F.2d 1138, 1140 (9th Cir. 1987). In *Almodovar*, "the plaintiffs had already reached the California Supreme Court in a pending case that presented the same issues as their federal suit, so they would not need to 'undergo the expense or delay of a full state court litigation' while their federal case was stayed." *Courthouse News Serv.*, 750 F.3d at 784 (citing *Almodovar*, 832 F.2d at 1140).

Measured against these precedents, the district court correctly held that the first *Pullman* factor was not met. The Secretary contends otherwise, asserting that "elections are widely considered a sensitive area of social policy," and that this is the "rare case," where abstention is warranted given ongoing parallel state court cases challenging the same Speech Provision. However, neither of these points is convincing.

Although state election laws are a sensitive area of social policy, *see Burdick*, 846 F.2d at 589, this does not outweigh the significant federal interest in free expression. Indeed, we have repeatedly declined to find the first *Pullman* factor met

in contexts that implicate state election law.  *See Porter*, 319 F.3d at 487, 492 (finding that the first prong of *Pullman* abstention was not met, where the plaintiff asserted that the California Secretary of State's threatened prosecution of California Elections Code chilled First Amendment conduct); *Wolfson v. Brammer*, 616 F.3d 1045, 1052 (9th Cir. 2010) (finding that the first prong of *Pullman* abstention was not met, where the plaintiff asserted that Arizona's Code of Judicial Conduct chilled his political campaign speech); *Chula Vista Citizens for Jobs & Fair Competition*, 782 F.3d at 528 (finding that the first prong of *Pullman* abstention was not met, where Plaintiffs asserted a First Amendment challenge to California's elections code).

Moreover, the ongoing parallel state court case does not fall under *Almodovar*'s unusual and aberrational procedural setting where the question was at the doorstep of the state supreme court.  In that unique context, we concluded that "[t]he fears of chill that justify our preference against abstention in first amendment cases are not present in this instance," given the substantial likelihood that the issue of state law would be definitively resolved by the highest authority on that issue.  *Almodovar*, 832 F.2d at 1140.  By contrast, here, the state court litigation has yet to be resolved, even if it is further along than the federal case.  *See* Modified Scheduling Order, *Ariz. Free Enter. Club et.al v. Fontes*, No. CV2024-002760 (Ariz. Super. Ct. June 20, 2025) (moving dispositive motion deadline from June 23, 2025 to July 21, 2025).  Accordingly, the district court correctly denied the Secretary's motion for a stay.

## VI.   Conclusion

In sum, we **REVERSE** the district court with respect to its conclusion that Plaintiffs have demonstrated standing to

seek a preliminary injunction enjoining the Canvass Provision and **VACATE** the injunction as to that provision. However, we **AFFIRM** the district court's conclusion that Plaintiffs have standing to seek a preliminary injunction enjoining the Speech Provision, that Plaintiffs have satisfied the *Winter* factors, and that *Pullman* abstention was not appropriate.

**AFFIRMED** in part; **REVERSED** in part; and **VACATED** in part.